UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re:*
NM HOLDINGS COMPANY, LLC, *et al.,*

                    Debtors.
_____/

*In re:*
DELUXE PATTERN CORPORATION, *et al.*,

                    Debtors.
_____/

STUART A. GOLD, TRUSTEE,
Plaintiff,

v.

LARRY J. WINGET, SR., *et al.*,

Defendants.

Chapter 7

Case No. 03-48939
(Jointly Administered)
Judge Thomas J. Tucker

Chapter 7

Case No. 04-54977-TJT
(Jointly Administered)
Judge Thomas J. Tucker

Adv. Pro. No. 04-4373

(Consolidated with Adv. Pro. Nos.
03-5356, 03-5357, 03-5358, 03-
5359, 05-4963, 05-4964, 05-4966,
05-4968, 05-4969, 05-4972, 05-
5592, 06-4709, 06-4710, 06-4711,
06-4712, 06-4713, 06-4714, 06-
4715, 06-4717, 06-4718, 06-4719,
06-4720, 06-4721, 06-4722, 06-
4723, 06-4724, 06-4725, 06-4726,
06-4727, 06-4728, 06-4729, 06-
4730, 06-4731, 06-4732, and 06-
4733)

---

**OPINION REGARDING MOTIONS TO DISMISS
AND MOTIONS FOR MORE DEFINITE STATEMENT**

In these consolidated adversary proceedings, the Chapter 7 trustee in eleven jointly-administered bankruptcy cases seeks to recover a total of more than $320 million from Defendant Larry J. Winget, Sr. and numerous other defendants.

Before the Court are several motions to dismiss, and several motions in the alternative for more definite statement regarding, various counts in the Plaintiff Stuart A. Gold, Trustee's Complaint in Case No. 04-4373, and in his complaints in several other of the consolidated adversary proceedings.

The motions raise many issues, including issues about (1) a bankruptcy court's authority to order substantive consolidation of non-debtor entities with the estate of a bankruptcy debtor, particularly in light of the Supreme Court's decisions in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) and *Butner v. United States*, 440 U.S. 48 (1979); (2) the doctrine of judicial estoppel and related concepts; (3) statutes of limitation applicable to fraudulent transfer claims and preference-avoidance claims; (4) the extent to which Fed.R.Civ.P. 9(b) requires fraudulent transfer claims to be pleaded with particularity; and (5) the level of detail that must be alleged in order to state a claim, under Fed.R.Civ.P. 8 and 12(b)(6), for avoidance of preferential transfers.

The motions also raise several issues specific to Michigan law, including issues about (1) the extent to which the Michigan Business Corporation Act preempts fraudulent transfer claims under the Michigan Uniform Fraudulent Transfer Act; and (2) claims of unjust enrichment.

For the reasons discussed below, the Court will grant the motions to dismiss in part and deny them in part, and will deny all of the motions for more definite statement. The Court also will grant Gold leave to file an amended complaint.

2

## I. Background

### A. Procedural history

### 1. The Venture Holdings bankruptcy cases

Venture Holdings Company LLC ("Venture Holdings") (Case No. 03-48939) and ten of its related entities[1] filed voluntary chapter 11 bankruptcy petitions on March 28, 2003. The eleven cases are jointly administered under Case No. 03-48939. (The eleven Debtors in these cases are collectively referred to as the "Venture Debtors" and "Debtors"). An official unsecured creditors committee was formed on April 13, 2003.

Debtors were unable to confirm a plan. After a lengthy confirmation hearing, the Court denied confirmation of Debtors' second amended joint plan on January 21, 2005. The Court later approved the sale of substantially all of the Debtors' assets.[2] The sale closed on May 2, 2005.[3] On January 11, 2006, Debtors' bankruptcy cases were converted to Chapter 7. Stuart A. Gold was appointed as the Chapter 7 trustee on January 19, 2006.

---

[1] These related entities were: Vemco, Inc. (Case No. 03-48940), Venture EU Corporation (Case No. 03-48941), Venture Leasing Company (Case No. 03-48942), Venture Service Company (Case No. 03-48943), Vemco Leasing, Inc. (Case No. 03-48944), Venture Mold & Engineering Corporation (Case No. 03-48945), Venture Industries Corporation (Case No. 03-48946), Experience Management LLC (Case No. 03-48947), Venture Europe, Inc. (Case No. 03-48948), and Venture Holdings Corporation (Case No. 03-48949).

[2] *See* Order filed April 19, 2005 (Docket No. 3222 in Case No. 03-48939).

[3] As a result of this sale, the business names of the Debtors changed and they are now known as: NM Holdings Company LLC (f/k/a Venture Holdings Company LLC), NM Emco, Inc. (f/k/a Vemco, Inc.), NM EU Corporation (f/k/a Venture EU Corporation), NM Old Leasing Company (f/k/a Venture Leasing Company), NM Service Company (f/k/a Venture Service Company), NM Nemco Leasing, Inc. (f/k/a Vemco Leasing, Inc.), NM Mold & Engineering Corporation (f/k/a Venture Mold & Engineering Corporation), NM Industries Corporation (f/k/a Venture Industries Corporation), NM Exp LLC (f/k/a Experience Management LLC), NM Europe, Inc. (f/k/a Venture Europe, Inc.), and NM Holdings Corporation (f/k/a Venture Holdings Corporation).

3

## 2. The Deluxe Pattern bankruptcy cases

Deluxe Pattern Corporation and eight of its related entities[4] filed voluntary chapter 11 bankruptcy petitions on May 24, 2004. The nine cases are jointly administered under Case No. 04-54977. (The nine Debtors in these cases are collectively referred to in this opinion as the "Deluxe Debtors"). The Deluxe Debtors continued business operations, engaged in efforts to confirm a reorganization plan, and filed various adversary proceedings.

The Deluxe Debtors were all owned, directly or indirectly, and controlled by, Larry J. Winget. Winget also controlled, directly or indirectly, all of the Venture Debtors. Unlike the Venture Debtors, which were under Winget's control when they filed their voluntary bankruptcy petitions in 2003, the Deluxe Debtors were no longer under Winget's control when they filed their bankruptcy petitions in 2004. Rather, they were then controlled by a Board of Directors appointed by certain secured creditors of the Venture and Deluxe Debtors, who had exercised their rights under stock pledges that Winget had given them, to secure his personal guaranty of the Venture and Deluxe Debtors' secured debt.

The Deluxe Debtors sold substantially all of their assets, in conjunction with the sale of the Venture Debtors' assets, all of which the Court approved in an Order filed on April 19, 2005 in the jointly-administered Venture cases.[5] As noted above, that sale closed on May 2, 2005.

Several of the Deluxe Debtors filed adversary proceedings against Larry J. Winget and his

---

[4] The eight related entities are: Farm & Country Real Estate Company (Case No. 04-54978); Venture Real Estate Acquisition Company (Case No. 04-54986); Patent Holding Company (Case No. 04-54989); Realven Corporation (Case No. 04-54991); Venture Automotive Corp. (Case No. 04-54992); Venture Equipment Acquisition Company (Case No. 04-54995); Venture Heavy Machinery, LLC (Case No. 04-55000); and Venture Real Estate, Inc. (Case No. 04-55002).

[5] *See* Order filed April 19, 2005 (Docket No. 3222 in Case No. 03-48939).

4

affiliated entities which were not in bankruptcy, on August 15, 2005, May 23, 2006, and May 24, 2006. Twenty-five of these cases remain pending and are consolidated with Case No. 04-4373,[6] but none of these cases are involved in the motions addressed by this opinion.

The Deluxe Debtors filed a joint chapter 11 plan, then later a "modified" first amended plan, then later a second amended plan,[7] but withdrew each plan without prejudice.[8] Ultimately, on January 11, 2008, the Court entered an order converting the Deluxe cases to Chapter 7, effective January 30, 2008. Basil T. Simon is the Chapter 7 Trustee in each of the Deluxe cases.

### 3. These adversary proceedings

On April 5, 2004, while the Venture bankruptcy cases were still in Chapter 11, Debtors and the official committee of unsecured creditors jointly filed a thirteen count complaint against 31 defendants, initiating adversary proceeding no. 04-4373.

In Count XI of the complaint, Plaintiffs sought the avoidance and recovery of preferential transfers against a group of eight defendants identified as the "Corporate Preference Defendants."[9] On August 30, 2005, the Court granted a motion by Plaintiffs to sever their preference claims against the "Corporate Preference Defendants" from the claims against the other defendants in the Original Complaint.[10] The severed claims are now the subject of a

---

[6] They are Case Nos. 05-5592, 06-4709 through 06-4715, and 06-4717 through 06-4733.

[7] Docket ## 287, 332, 341, 637 in Case No. 04-54977.

[8] *See* Order, Docket # 615; Order, Docket # 701 in Case No. 04-54977.

[9] These eight defendants are Nova Industries, Inc.; Shefco, Inc.; TIG Interior Design, LLC; UV Automotive Group; Lot Finishers, Inc.; Windall Industries, Inc.; Acropolis Resort, LLC; and Lakeland Financial Advisory Services, Inc.

[10] *See* "Order Granting the Debtors' Motion to Sever Claims Against The Corporate Preference Defendants From Claims Against Non-Preference Defendants" (Docket # 102 in Adv. Pro. # 04-4373).

separate adversary proceeding, Case No. 04-5178.

Gold, Trustee, substituted as Plaintiff in this adversary proceeding and in other adversary proceedings previously filed by Debtors and/or the Committee. Gold and certain defendants later stipulated to the consolidation of eight other adversary proceedings into this adversary proceeding for discovery and trial purposes.[11] Later, 27 more adversary proceedings were consolidated with this one, for pretrial purposes.[12]

Several defendants in Case No. 04-4373 filed motions to dismiss Gold's Complaint or, in the alternative, for a more definite statement. These moving defendants are grouped as follows:

- Larry J. Winget, Sr. ("Larry Winget" or "Winget"); Venture Nevada LLC ("Venture Nevada"); Pompo Insurance & Indemnity Company, Ltd., ("Pompo"); VIR Company LLC ("VIR"); and Modas LLC ("Modas");[13]

- N. Mathew Winget ("N. Winget") and Linden Creek Enterprises, LLC ("Linden Creek");[14]

- Golf Course Services, Inc. ("GAS"); Winget Construction Services, LLC ("WCS"); and individual defendants, Gwendolyn Cameron, Adelicia J. Tiganelli, Brian P. Winget and Alicia J. Winget;[15] and

- Venture Asia Pacific Pty., Ltd. ("Venture Asia"), and Venture Industries Australia Pty., Ltd. ("Venture Australia")(motion to dismiss only; no

---

[11] These eight adversary proceedings consolidated into this one (04-4373) are nos. 03-5356, 03-5358, 05-4963, 05-4964, 05-4966, 05-4968, 05-4969, and 05-4972. *See* Docket # 209.

[12] The additional adversary proceedings consolidated into this one are two cases related to the Venture bankruptcy cases: 03-5357 and 03-5359, and 26 cases related to the Deluxe bankruptcy cases: 06-4709 through 06-4715, 06-4717 through 06-4733, and 06-4738. *See* "Order Granting Defendants' Motion to Consolidate Related Adversary Proceedings" (Docket # 315). Of these, Case No. 06-4738 was later dismissed. (Docket # 324).

[13] Docket ## 125, 128.

[14] Docket ## 105, 110.

[15] Docket ## 113, 117.

motion for more definite statement.)[16]

In several of the other adversary proceedings that are consolidated with Case No. 04-4373, the defendants also filed motions to dismiss and motions in the alternative for more definite statement. These motions raise issues that are essentially the same as issues raised by the motions in Case No. 04-4373, and are discussed more specifically at the end of this opinion.

The Court has entered several scheduling orders in these cases, and discovery is ongoing. The Court heard oral argument on the motions, at multiple hearings. This opinion addresses all of the motions.

## II. Jurisdiction

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). It is clear that all claims in these consolidated adversary proceedings seeking to avoid and recover preferences or fraudulent transfers are core proceedings, under 28 U.S.C. § 157(b)(2)(F) and (H), respectively. For purposes of this opinion and given the Court's disposition of the motions at hand, and under 28 U.S.C. §§ 157(b)(1) and 157(c), it is not necessary, at this time, to determine the extent to which any other claims are core proceedings.

## III. Applicable legal standards

### A. Standards governing the motions to dismiss

Defendants bring their motions to dismiss under Fed.R.Civ.P. 12(b)(6), applicable in this adversary proceeding through Fed.R.Bankr.P. 7012, arguing that several counts in the Complaint fails to state a claim upon which relief can be granted.

---

[16] Docket # 133.

7

A motion under Rule 12(b)(6) tests the "sufficiency of [a] complaint." *Conley v. Gibson*, 355 U.S. 41, 45 (1957). A court must examine the plaintiff's allegations and determine whether, as a matter of law, "the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "[A] court considering a motion to dismiss under Rule 12(b)(6) 'must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff.'" *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 605 (6th Cir. 2005)(quoting *Inge v. Rock. Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002)(citing *Turker* v. *Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998))).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the United States Supreme Court revisited the standards that govern Rule 12(b)(6) dismissal motions. In doing so, the Court rejected "'the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Twombly*, 550 U.S. at 561 quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). As the Court explained,

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief **requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] Factual allegations must be enough to raise a right to relief above the speculative level**, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]

8

*Id.* at 555-56 (emphasis added)(citations and footnote omitted). The Court went on to hold that:

> stating . . . a claim requires a complaint with enough factual matter
> (taken as true) to suggest [grounds for relief]. Asking for plausible
> grounds to infer [a right to relief] does not impose a probability
> requirement at the pleading stage; it simply calls for enough fact to
> raise a reasonable expectation that discovery will reveal evidence
> of [an entitlement to relief]. And, of course, a well-pleaded
> complaint may proceed even if it strikes a savvy judge that actual
> proof of those facts is improbable, and "that a recovery is very
> remote and unlikely."

*Id.* at 556 (citations omitted). *See also Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200

(2007)(Fed.R.Civ.P. 8(a)(2) "requires only 'a short and plain statement of the claim showing that

the pleader is entitled to relief.' Specific facts are not necessary[.]"))

### B. Standards governing the motions for more definite statement

As amended effective December 1, 2007, Civil Rule 12(e), which applies in this

adversary proceeding through Fed.R.Bankr.P. 7012(b), states in pertinent part that:

> A party may move for a more definite statement of a pleading to
> which a responsive pleading is allowed but which is so vague or
> ambiguous that the party cannot reasonably prepare a response.
> The motion must be made before filing a responsive pleading and
> must point out the defects complained of and the details desired.[17]

Motions for more definite statement under Fed.R.Civ.P. 12(e) are generally disfavored in the

federal courts. In *In re European Rail Pass Antitrust Litigation,* 166 F. Supp.2d 836, 844

(S.D.N.Y. 2001)(citations omitted), the court explained:

---

[17] Fed.R.Civ.P. 12(e). Before the December 1, 2007 amendment, Rule 12(e) stated, in pertinent part, that:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a
> party cannot reasonably be required to frame a responsive pleading, the party may move
> for a more definite statement before interposing a responsive pleading. The motion shall
> point out the defects complained of and the details desired.

9

[I]t is well settled that such motions "generally are disfavored because of their dilatory effect." It "is designed to strike at unintelligibility rather than want of detail and ... allegations that are unclear due to a lack of specificity are more appropriately clarified by discovery rather than by an order for a more definite statement." As this Court has previously explained, "[a] motion pursuant to Rule 12(e) should not be granted 'unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it.'"

*See also Cooper Ins. Agency Ctr. v. Mourer-Foster, Inc.*, No. 5:05-CV-56, 2005 WL 3289345, at

*1 (W.D. Mich. December 5, 2005)("Rule 12(e) motions are disfavored by most courts and are

rarely granted")(citations omitted); *Green v. Begley Co.*, No. 1:08cv77, 2008 WL 4449065, at *4

(S.D. Ohio Sept. 29, 2008)(same); *Jones v. Select Portfolio Servicing, Inc.*, No. 08-972, 2008

WL 1820935, at *2 (E.D. Pa. April 22, 2008)("Rule 12(e) motions . . . 'are highly

disfavored")(citations omitted).

## IV. The Complaint in Case No. 04-4373

### A. Counts and allegations pled in the Complaint

The 91-page Complaint filed in Case No. 04-4373 named 31 defendants,[18] including

various corporate entities[19] and six individuals. In the Preamble of the Complaint, the defendants

are listed in three groups. The first group is designated as the "Corporate Defendants," which

---

[18] The claims against certain defendants (collectively referred to as "Corporate Preference Defendants") were severed from the complaint in this adversary proceeding. These Corporate Preference Defendants are Nova Industries, Inc., Shefco, Inc. TIG Interior Design, LLC, UV Automotive Group, Lot Finishers, Inc., Windall Industries, Inc., Acropolis Resort, LLC, and Lakeland Financial Advisory Services, Inc. (*See* Docket #102.). Gold continues to prosecute his complaint against these defendants in adversary proceeding no. 04-5178, which is not consolidated with this adversary proceeding.

[19] Included among these corporate defendants were eight of the nine Deluxe bankruptcy debtors who, as noted above, filed chapter 11 bankruptcy petitions on May 24, 2004. These corporate defendants were: Deluxe Pattern Corporation; Patent Holding Company; Venture Heavy Machinery, LLC; Venture Real Estate, Inc.; Realven Corporation; Venture Equipment Acquisition Company; Farm & Country Real Estate Company; and Venture Real Estate Acquisition Company.

10

includes defendants Venture Australia, Venture Nevada, Pompo, Venture Heavy Machinery, GAS, Venture Real Estate, Inc., Realven Corporation, Modas, LLC, Linden Creek, Venture Equipment Acquisition Company, Venture Otto South Africa, Pty., Ltd., Moldite, Inc., Farm & Country Real Estate Company, WCS, VIR Co., LLC, Venture Real Estate Acquisition Company, and Venture Asia.[20]  The second group is defined as the "Individual Defendants," who are the defendants Alicia Winget, Brian Winget, N. Matthew Winget, Adelicia Tiganelli, and Gwendolyn Cameron.[21]  The Complaint then defines the remaining group as the "Defendants," which consists of "Larry J. Winget, Sr., the Corporate Defendants, and the Individual Defendants."[22]

The Complaint has 565 paragraphs, thirteen counts, and in total, seeks to recover over $320 million from the Defendants.  It contains a "General Allegations" section, which includes an extensive recitation of allegations about the transactions that occurred between the Debtors on the one hand and the Corporate Defendants or the "Winget Affiliates" on the other hand.[23]  The Complaint then incorporates these "General Allegations" into each Count of the Complaint.  The thirteen counts are: (1) unjust enrichment ("Count I"); (2) breach of fiduciary duty ("Count II"); (3) avoidance of fraudulent transfers under 11 U.S.C. § 544 and Mich. Comp. Laws Ann. §§ 566.34, 566.35, and 566.38, and recovery under 11 U.S.C. § 550  ("Count III"); (4) avoidance

---

[20]  *See* Compl. at 3 (Docket # 1).

[21]  *Id.*

[22]  *Id.*

[23]  The "Winget Affiliates" are a group of corporate entities that are owned or controlled by Larry Winget.  This group consists of Deluxe Pattern Corporation; Venture Sales & Engineering; Harper Properties of Clinton Township, Ltd.; and Venture Automotive Corporation. *See* Compl. at 5 ¶ 11 (Docket # 1).

and recovery of fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) and 550 ("Count IV"); (5) avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B) and 550 ("Count V"); (6) recharacteriztion of debt as equity, or alternatively, to subordinate debt under 11 U.S.C. § 510(c) ("Count VI"); (7) substantive consolidation against Larry Winget, Alicia Winget, and the Corporate Defendants ("Count VII"); (8) imposition of a constructive trust ("Count VIII"); (9) appointment of an equity receiver ("Count IX"); (10) "Common Counts" ("Count X"); (11) avoidance and recovery of preferential transfers under 11 U.S.C. §§ 547(b) and 550(a)(1) ("Count XI"); (12) breach of contract pled as an alternative claim against Defendant Pompo Insurance & Indemnity Company, Ltd., only ("Count XII"); and (13) disallowance of claims under 11 U.S.C. § 502(d) ("Count XIII").[24]

The following is a summary of the allegations in the Complaint that are relevant to the motions before the Court.

## 1. General allegations

The Venture Debtors were "some of the largest designers, system integrators and manufacturers of interior and exterior plastic components and systems for the North American and European automobile manufacturers ("OEMS")."[25] Larry Winget was the chief executive officer and a director of each of the Debtors.[26] The Debtor, Venture Holdings, owned, directly or indirectly, all of the outstanding capital stock of or equity interest in all of the other Venture

---

[24] Compl. (Docket # 1).

[25] *Id.*. at 4 ¶ 9 (Docket # 1).

[26] *Id.* at ¶ 8.

Debtors.[27]  Venture Holdings Trust (the "Trust"), in turn, owned all of the equity interest of

Venture Holdings.[28]  The sole beneficiary of the Trust is Larry Winget.[29]

Winget also "wholly owned or controlled" the following corporate entities: Deluxe

Pattern Corporation, Venture Sales & Engineering, Harper Properties of Clinton Township, Ltd.,

and Venture Automotive Corporation (the "Winget Affiliates").[30]  From at least six years before

the Venture bankruptcy petition date, Winget "controlled, dominated, and/or operated each of the

Corporate Defendants and Winget Affiliates as his individual business and alter-ego."[31]  As a

result, a "unity of interest and ownership between Winget" and these corporate entities developed

that eliminated "any separateness between them."[32]

The Complaint alleges that the Venture Debtors entered into a series of transfers with the

Corporate Defendants and Winget Affiliates for which Debtors received little or no

consideration, and less than reasonably equivalent value.[33]  The Complaint alleges that the true

recipients of any and all transfers made by the Venture Debtors were Winget, the Corporate

---

[27]  *Id*. at ¶ 6.

[28]  *Id*. at ¶ 7.

[29]  *Id*.

[30]  Compl. at 5, ¶ 11 (Docket # 1).  None of the Winget Affiliates are named as defendants in adversary proceeding no. 04-4373.  Some of them, however, are named as defendants in other adversary proceedings, namely: *Gold v. Venture Sales & Engineering Corp.*, #03-5356; *Gold v. Harper Properties of Clinton Twp. Ltd.*, No. 03-5358, and *Gold v. Venture Automotive Corp.*, No. 03-5357.  These adversary proceedings have been consolidated with no. 04-4373.

[31]  *Id*. at 6, ¶ 13.

[32]  *Id*.

[33]  *Id*.

13

Defendants, Winget Affiliates, and in certain cases, the Individual Defendants.[34]  The Complaint

also alleges that Winget benefitted either directly or indirectly from some or all of the alleged

transfers.[35]

### 2. Series of transfers between Debtors and the Corporate Defendants

The Complaint alleges a series of transfers by the Venture Debtors to the Corporate

Defendants.  Some examples of these are described here.

#### a. Pompo Insurance & Indemnity Company, Ltd.

The Complaint alleges that Pompo Insurance & Indemnity Corporation, Ltd. ("Pompo")

is incorporated in Barbados, West Indies.[36]  Winget is the indirect owner of Pompo:  Venco

Management Canada, Ltd, ("Venco Mgmt. Canada") owns 100% of Pompo.[37]  P.I.M

Management Company, d/b/a PIM, Inc., owns Venco Mgmt. Canada.[38]  Winget is the sole owner

of PIM Mgmt, which is incorporated in Michigan.[39]  Pompo provided "insurance coverage for the

Venture Debtors' self-insured workers' compensation and health programs, as well as Debtors'

deductible exposures under all other corporate insurance policies."[40]

Pompo provided the following insurance policies to the Venture Debtors within six years

---

[34] *Id*. at 6 ¶ 15.

[35]  I*d*.

[36] *Id*. at 14 ¶ 71.

[37] *Id*.

[38] Compl. at 14 ¶ 71 (Docket #1).

[39] *Id*.

[40] *Id*.

before Debtors' petition date:

(1)     Specific Excess Workers' Compensation and Employers' Liability Indemnity Policy, No. VII WC0001-100-001 ("Workers' Compensation Policy");

(2)     Excess Medical Reimbursement Policy, No. VII MD001-100-001 ("Excess Policy");

(3)     Specific Excess Reimbursement Policy, No. VII MD2001-100-003 ("Specific Excess Policy"); and

(4)     Deductible Reimbursement Policy, No. PP001 ("Deductible Policy").[41]

Under the Workers' Compensation Policy, "Pompo was to pay or reimburse all of Debtors' workers' compensation claims, subject to a specific limit of $250,000 per occurrence and an annual aggregate limit that varied with each policy year."[42]  Within six years before the Venture bankruptcy petition date, Debtors paid Pompo $2,450,500 in workers' compensation premiums.[43]  During this same time, Debtors paid covered workers' compensation claims of $8,495,497.[44]  But Pompo has not paid or reimbursed Debtor for the covered workers' compensation claims.[45]

The Specific Excess Policy required "Pompo [] to: (a) pay or reimburse certain of the self-insured health claims incurred by the Debtors; and (b) provide the Debtors with a credit in the amount of 80% of the difference between the annual premiums paid and the total annual claims covered by the policy."[46]  Within six years before the petition date, Debtors paid Pompo

---

[41] *Id.* at 14-15 ¶ 72.

[42] *Id.* at 15 ¶ 73.

[43] *Id.* ¶ 74.

[44] Compl. at 15 ¶ 74 (Docket #1).

[45] *Id.*

[46] *Id.* at ¶ 75.

$3,725,200 in Specific Excess Policy premiums.[47]  But "Pompo failed and refused to pay or reimburse the Debtors for claims incurred by the Debtors and further failed to provide premium credit refunds in the total amount of at least . . . $3,148,091."[48]

Under the terms of the Excess Policy, "Pompo was to: (a) pay or reimburse certain of the self-insured health claims incurred by the Debtors in the event that Debtors became unable to provide existing benefits; and (b) provide the Debtors with a credit in the amount of 80% of the difference between the annual premiums paid and the total annual claims covered by the policy."[49]  Within six years before the petition date, Debtors paid Pompo $1,200,000 in Excess Policy premiums.[50]  During this time, Debtors were "able to provide existing benefits to their employees and consequently Pompo [] never had to pay or reimburse the Debtors for any claims under the Excess Policy."[51]  But Pompo failed to provide a premium credit refund of $960,000 owing to the Debtors.[52]

The Deductible Policy required Pompo to "reimburse the Debtors for any deductibles that were paid by the Debtors on certain corporate insurance policies."[53]  Under the initial term of the

---

[47] *Id.* at ¶ 76.

[48] *Id.*

[49] *Id.* at ¶ 77.

[50] *Id.* at ¶ 78.

[51] *Id.*

[52] *Id.*

[53] *Id.* at 16 ¶ 79.

16

Deductible Policy, Debtors paid $1,100,000 in premiums.[54] Within the initial term, on June 17, 2001, Debtors paid a deductible of $250,000 which is reimbursable under the Deductible Policy.[55] In addition, for the second policy year, "Debtors paid Pompo a deposit premium of $275,000 for a pending renewal of the Deductible Policy" but the "renewal was eventually abandoned and never bound."[56] Pompo "failed and refused to either reimburse the Debtors for the $250,000 deductible under the initial term of the Deductible Policy or return the $275,000 deposit premium for the failed renewal of the Policy."[57]

In addition, Debtors transferred $5,412,381 to Pompo as of December 31, 2002, in order to create a cash reserve deposit.[58] These sums were "transferred in addition to the premiums paid by Debtors pursuant to the foregoing insurance policies."[59] Third party administrators ("TPA's") unrelated to Pompo managed Debtors' self-insured workers' compensation and health insurance programs.[60] During all relevant times, "the TPA's maintained adequate cash reserves – using funds provided by the Debtors – to cover future claim payments, and Pompo [] never paid any claims under the foregoing insurance policies out of the [cash reserve] [d]eposit or its own

---

[54] Compl. at 16 ¶ 80 (Docket # 1).

[55] *Id.*

[56] *Id.* at ¶ 81.

[57] *Id.* at 17 ¶ 82.

[58] *Id.* at ¶ 83.

[59] *Id.*

[60] Compl. at 17 ¶ 84 (Docket # 1).

funds."[61] There was no legitimate reason for the transfer to create the cash reserve deposit to Pompo or for Pompo's continued retention of these funds.[62] Debtors "transferred the money to Pompo without receiving reasonably equivalent value in exchange for the transfers."[63]

### b. Modas, LLC

Winget is the owner of Modas, LLC ("Modas"), which provides sequencing and trucking services.[64] In early 2001, the following wire transfers were made by "one or more of the Debtors" to Modas: (1) $700,000 on January 12; (2) $600,000 on January 22; and (3) $561,882 on March 22.[65] The total amount of these wire transfers is $1,861,882.[66] None of the Debtors have any records that explain the purposes of or reasons for these wire transfers, or that show that the "Debtors received any consideration or benefit in exchange for them."[67]

### c. VIR Company, LLC

Winget owns, either directly or indirectly, VIR Company, LLC ("VIR"), which is located in Moscow, Russia.[68] VIR provided engineering services to Deluxe Pattern Acquisition Corporation, a company wholly-owned by Winget.[69] Between June 17, 1999 and May 13, 2002,

---

[61] *Id.*

[62] *Id.*

[63] *Id.* at ¶ 85.

[64] Compl. at 28 ¶ 178 (Docket # 1).

[65] *Id.*

[66] *Id.* at ¶ 179.

[67] *Id.* at ¶ 180.

[68] *Id.* at 43 ¶¶ 312 and 313.

[69] *Id.*

18

one or more of the Debtors transferred money to VIR without receiving any consideration in return.[70] The sum of $164,156 remains due and owing by VIR.[71] No agreement exists between Debtors and VIR that would justify these transfers.[72]

### 3. Series of transfers between the Debtors and the Winget Affiliates

The Complaint alleges that numerous transfers were made by the Debtors to the Winget Affiliates. Some examples are described here.

### a. Alleged transfers to Deluxe Pattern Corporation

In 1989, Winget acquired Deluxe Pattern Corporation ("Deluxe"), which manufactured specialty tooling.[73] Debtors used Deluxe's services from 1989 through December 31, 2000.[74] The Debtor Venture Mold & Engineering Corporation ("VM&E") in particular "used Deluxe's designs to fabricate [] tools."[75] On January 1, 2001, VM&E "transferred all of its employees, expertise, intellectual know-how and good-will to Deluxe."[76] "VM&E was left as a virtual shell corporation that merely leased space and equipment to Deluxe."[77] VM&E had an estimated value at the time of the transfer of $32,677,256.[78] No purchase agreement exists between Debtors and

---

[70] Compl. at 44 ¶¶ 314 and 322 (Docket # 1).

[71] *Id.* at ¶ 314.

[72] *Id.* at ¶ 320.

[73] Compl. at ¶¶ 385 and 386.

[74] *Id.* at ¶ 386.

[75] *Id.*

[76] *Id.* at ¶ 387.

[77] *Id.*

[78] *Id.* at ¶ 388.

19

Deluxe for this transfer, and no consideration was paid to the Debtors.[79]  Before the transfer,

"VM&E was capable of manufacturing the tools with its own employees and resources, but [it]

transferred this capability, intellectual know-how and expertise, along with its future financial

benefits to Deluxe."[80]  After January 2001, "Deluxe began fabricating the tools for the Debtors."[81]

Debtors were Deluxe's only significant customers and the amount of revenue that Deluxe earned

from other sources is minimal.[82]

### b.  Alleged transfers to other Winget Affiliates.

In addition to the transfers to Deluxe Pattern Corporation, described above, the Complaint

alleges that the Debtors made substantial transfers to other Winget Affiliates, including Venture

Sales & Engineering;[83] Harper Properties of Clinton Township, Ltd.;[84] and Venture Automotive

Corporation.[85]  These transfers allegedly were made for less than reasonably equivalent value.

### 4.  Larry J. Winget, Sr.

Eleven of the Complaint's thirteen counts assert claims against Winget.  The basic theme

of the Complaint is that Winget abused each of the Venture Debtors when he manipulated and

used them for his own personal gain.  The Complaint alleges that over a period of many years,

---

[79]  *Id.* at ¶ 389.

[80]  *Id.* at ¶ 390.

[81]  *Id.* at ¶ 387.

[82]  *Id.* at ¶ 391.

[83]  *Id.* at ¶¶ 414-41.

[84]  *Id.* at ¶¶ 442-59.

[85]  *Id.* at ¶¶ 460-75.

Winget directed a complex scheme of fraudulent transactions between the Debtors on the one hand and the Corporate Defendants and the Winget Affiliates on the other hand. The Complaint alleges that Winget devised and implemented this scheme in his capacity as "sole equity holder, director[,] and managing member of Venture," and through his role as a member of the board of directors of each of the Debtors.[86] In light of these officer positions held by Winget, Gold then alleges that Winget owed fiduciary duties to the Debtors and, as of March 29, 2002, "to the entire community of interest in the Debtors, including but not limited to the Unsecured Creditors."[87] Gold alleges that Winget breached his fiduciary duties when he "either willfully or recklessly" caused the Debtors to transfer some or all of the amounts alleged in the Complaint to the Defendants.[88] By authorizing the transfers, Winget allegedly failed to "(a) discharge his duties in good faith; (b) exercise the duty of care an ordinarily prudent person in a like position would exercise under similar circumstances; and/or (c) act in a manner he reasonably believed to be in the best interests of the Debtors."[89]

In addition, Gold alleges that Winget violated his fiduciary duties post-petition when he failed:

> to disclose to the Debtors his personal interest in and motives regarding the restructuring, including but not limited to his failure to disclose to the Debtors a December 2003 letter of intent with Yucaipa for the purchase of the Debtors' assets, and otherwise delaying the restructuring process. These actions taken by Winget are contrary to the best interests of the

---

[86] *Id.* at 50 ¶ 371-73.

[87] *Id.* at ¶ 372.

[88] *Id.* at 51 ¶ 377.

[89] *Id.* at ¶ 378.

Debtors' estate[s].[90]

Gold alleges that Winget's post-petition actions caused the Debtors to "incur enormous expenses for professional fees related to the restructuring process."[91]

## V. Discussion of the motions in Case No. 04-4373

The Defendants seek dismissal of eleven of the thirteen Counts in the Complaint filed in Case No. 04-4373, for a variety of reasons, under Fed.R.Civ.P. 12(b)(6). Gold has agreed to voluntarily withdraw Counts IX and X as to all of the Defendants, so the Court will dismiss those Counts.[92] Defendants seek dismissal of several of the remaining counts in the Complaint. The Court will separately address Defendants' arguments.

### A. Count III - Defendants' argument that Gold's fraudulent transfer claims under Michigan law are barred by the Michigan Business Corporation Act

In Count III, invoking his powers under 11 U.S.C. § 544(b)(1), Gold seeks to avoid alleged fraudulent transfers under Michigan's Uniform Fraudulent Transfer Act ("MUFTA").[93] Gold

---

[90] *Id.* at 52 ¶ 380.

[91] *Id.* at 52 ¶ 381.

[92] *See* "Objection by Official Committee of Unsecured Creditors to Motion of Defendants Larry J. Winget, Sr., et al., to Dismiss the Adversary Complaint in Part" at 2 n.2 (Docket # 163). These withdrawn counts are the "Appointment of an Equity Receiver" and "Common Counts" counts. Although the intention to withdraw these two counts was first stated in a brief filed by the creditor's committee (originally a co-plaintiff with Debtors in Case No. 04-4373), Gold later adopted the Committee's position and arguments.

[93] The MUFTA addresses both actual and constructively fraudulent transfers. Mich. Comp. Laws Ann. § 566.34(1)(a) deals with actual fraud, and provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:

> (a) With actual intent to hinder, delay, or defraud any creditor of the

22

seeks to recover the avoided transfers from certain defendants, under 11 U.S.C. § 550.

The Defendants argue that Count III fails to state a claim because as pled, it is barred by

Michigan's Business Corporation Act ("MBCA").[94]  Defendants contend that the alleged

fraudulent transfers made by the Debtors "are described . . . as indirect transfers done for the

---

debtor.

The MUFTA deals with constructive fraud, in two sections.  Mich.  Comp. Laws Ann.
§ 566.34(1)(b) states:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor, whether the creditor's claim arose before or after the transfer was made
> or the obligation was incurred, if the debtor made the transfer or incurred the
> obligation in either of the following:
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer
> or obligation, and the debtor did either of the following:
>
>> (*i*) Was engaged or was about to engage in a business or a
>> transaction for which the remaining assets of the debtor were
>> unreasonably small in relation to the business or transaction.
>>
>> (*ii*) Intended to incur, or believed or reasonably should have
>> believed that he or she would incur, debts beyond his or her
>> ability to pay as they became due.

And Mich. Comp. Laws Ann. § 566.35 states:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor whose claim arose before the transfer was made or the
> obligation was incurred if the debtor made the transfer or incurred the
> obligation without receiving a reasonably equivalent value in exchange
> for the transfer or obligation and the debtor was insolvent at that time or
> the debtor became insolvent as a result of the transfer or obligation.
>
> (2) A transfer made by a debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made if the transfer was made to an
> insider for an antecedent debt, the debtor was insolvent at that time, and
> the insider had reasonable cause to believe that the debtor was insolvent.

[94]  Mich. Comp. Laws Ann. § 450.1101 to § 450.2099 (West 2002).

23

benefit of Winget.  As pled, [each of] these transfers meet the definition of distributions under the

MBCA."[95]  Defendants rely on the exclusion clause in the MBCA, which states, in relevant part,

that the MUFTA "does not apply to distributions governed by this act."  Mich. Comp. Laws Ann.

§ 450.1122(3).  Based on this statute, Defendants argue that Gold cannot avoid any of the alleged

fraudulent transfers under the MUFTA, but instead must bring any claim under the MBCA.

Among other things, the MBCA prohibits a corporation from making a "distribution"

under certain circumstances related to the corporation's financial health.  For example, a

corporation may not make a distribution "if, after giving it effect, the corporation would not be

able to pay its debts as the debts become due in the usual course of business."  Mich. Comp. Laws

Ann. § 450.1345(3).  And the MBCA imposes liability, under certain circumstances, on the

directors and shareholders of a corporation that makes a prohibited distribution.  *See* Mich. Comp.

Laws Ann. §§ 450.1551(1); 450.1551(2); 450.1551(3).

The MBCA defines a "distribution" as:

> a direct or indirect transfer of money or other property, except the
> corporation's shares, or the incurrence of indebtedness by the
> corporation **to or for the benefit of its shareholders in respect to**
> **the corporation's shares.  A distribution may be in the form of a**
> dividend, a purchase, redemption or other acquisition of shares, an
> issuance of indebtedness, or any other declaration or **payment to or**
> **for the benefit of the shareholders.**

Mich. Comp. Laws. Ann. § 450.1106(4)(emphasis added).

Gold argues that none of the alleged transfers were "distributions" as that term is defined

in the MBCA.  He notes that the Complaint does not allege that any of the fraudulent transfers

---

[95]  Defendants' Br. in Supp. at 9 (Docket # 129).

24

"were made 'in respect to' an ownership interest in any of the Debtors."[96]  He also argues that the

Complaint does not allege that Winget or any of the other Defendants were shareholders of any of

the Venture Debtors.  The allegations of the Complaint, therefore, do not establish that the

transfers were distributions as defined under the MBCA.[97]

Construing the Complaint in the light most favorable to Gold, as the Court must, the Court

agrees with Gold.  The Court cannot conclude, from the allegations in the Complaint, that any of

the alleged fraudulent transfers were "distributions" under the MBCA.

Neither side has cited any Michigan case that construes the MBCA's definition of

"distribution."  It is clear from the  definition of "distribution," however, that a transfer is not a

"distribution" unless it is made "to or for the benefit of [the transferor corporation's]

shareholders," *and* made "in respect to the corporation's shares."  Mich. Comp. Laws Ann.

§ 450.1106(4).  Neither requirement is met under the allegations of the Complaint.

1. **The requirement that the transfer(s) be made to or for the benefit of the transferor-corporation's "shareholders"**

First, as properly construed at this motion-to-dismiss stage of the case, the Complaint does

not allege that any of the transfers at issue in Count III (the MUFTA count) were made to or for

the benefit of any shareholder of any of the Venture Debtors (the transferors).  The MBCA defines

"shareholder" as "a person holding units of proprietary interest in a corporation[.]"  Mich. Comp.

Laws. Ann § 450.1109(1).

Defendants point to paragraph 15 of the Complaint, which alleges that:

---

[96]  "Objection by Official Committee of Unsecured Creditors to Motion of Defendants, Larry J. Winget, Sr., et al., To Dismiss The Adversary Complaint In Part" at 8 (Docket # 163).

[97]  *Id*. at 8 ¶ 22.

> Winget, the Corporate Defendants and the Winget Affiliates, and in certain circumstances. . ., the Individual Defendants, were the true recipients of all transfers alleged herein. Winget has either directly or indirectly received the benefit of some or all of the transfers referenced herein.[98]

But the Complaint, properly construed, does not allege that any of these Defendants — Winget, the "Corporate Defendants," or the "Winget Affiliates" — were shareholders of any of the Venture Debtors (the transferors). Rather, paragraphs 6 and 7 of the Complaint allege otherwise. Paragraph 6 alleges that the Debtor Venture Holdings "owns, directly or indirectly, all of the outstanding capital stock of, or equity interest in, all of the other Debtors." Paragraph 7 then alleges that "[a]ll of the equity interest of [Venture Holdings] is held by Venture Holdings Trust (the "Trust"). "It also alleges that Defendant "Larry J. Winget is the sole beneficiary of the Trust."[99] According to paragraphs 6 and 7 of the Complaint, then, neither Winget nor any of the other Defendants was a shareholder of any of the Venture Debtors. Rather, the single Venture Debtor that owned, directly or indirectly, all of the stock of all of the other Venture Debtors — Venture Holdings — was owned by the Trust, not by Larry Winget or any of the other Defendants.

This requires the Court to reject, at this stage of the case, Defendants' argument that the MBCA applies to make any of the allegedly fraudulent transfers "distributions." The Court notes, however, that there are allegations in Gold's lengthy Complaint that arguably conflict with the allegations in paragraphs 6 and 7, described above, by arguably alleging that Larry Winget *was* a shareholder of one or more of the Venture Debtors. Elsewhere in the Complaint, Gold repeatedly alleges that Winget was the "sole equity holder" of "Venture," *i.e.*, of the Venture Debtor that

---

[98] Compl. at 6 ¶ 15.

[99] *Id.* at 4 ¶ 7.

paragraph 6 says owned the stock of all of the other Venture Debtors.[100]  And elsewhere, Gold repeatedly refers to Winget as "the controlling shareholder of . . . the Debtors," *i.e.*, of all of the Venture Debtors, collectively.[101]  And the Complaint alleges that Winget "owns and controls the Debtors."[102]  But the Complaint also alleges that Winget was, at least in 1989, only the "**beneficial owner of the Debtors**."[103]

Gold attempts to reconcile this apparent conflict in his Complaint by arguing that Winget was not a "shareholder" of any of the Venture Debtors, as that concept is used in the MBCA, because his ownership interest in any of the Debtors was limited to his beneficial interest in the Trust.  That Trust, in turn, was the sole shareholder of Venture Holdings, which, in turn owned, directly or indirectly, the shares of all of the other Venture Debtors.  Gold (by adopting the Creditor's Committee's brief) argues this way:

> Similarly, Winget himself was not a shareholder of the Debtors.  On the contrary, the Complaint expressly alleges that Venture Holdings Company LLC owned, directly or indirectly, all of the outstanding capital stock of, or equity interest in, all of the other Debtors and that, in turn, Venture Holdings Trust held all of the equity interest of Venture Holdings Company LLC.  Complaint at ¶¶ 6-7.  Winget's interest as the sole beneficiary of Venture Holdings Trust does not make him a shareholder in any of the Debtors.  Moreover, the Committee is not aware of a single case wherein a court has applied Moving Defendants' [MBCA] 'preemption' argument in favor of a person who ultimately 'controls' the shares, as opposed to the named shareholder.[104]

---

[100]  Compl. at ¶¶ 6, 371, 375, 486.

[101]  *Id.* at ¶¶ 404c, 430c, 452c, 467c, 498c, 507c, and at p. 2, Preamble.

[102]  *Id.* at ¶ 520.

[103]  *Id.* at ¶ 386 (emphasis added).

[104]  "Objection by Official Committee of Unsecured Creditors to Motion of Defendants, Larry J. Winget, Sr., et al., To Dismiss The Adversary Complaint In Part" at 9 (Docket # 163).

27

Even if the Complaint allegations are in conflict, this issue is before the Court on Defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6), so as already noted several times, the Court must construe the Complaint in a light most favorable to Gold. This requires the Court to accept as true the allegations most favorable to Gold, namely, that Winget was *not* a shareholder of any of the Venture Debtors, as alleged in paragraphs 6 and 7 of the Complaint. Given this, and because none of the other Defendants are alleged (even arguably) to have been shareholders of any of the Venture Debtors, the Court cannot conclude from the Complaint that the transfers at issue were "distributions" under the MBCA.

### 2. The requirement that the transfer(s) be made "in respect to the corporation's shares"

There is a second reason why the Court cannot conclude, from the Complaint, that any of the alleged fraudulent transfers were "distributions" under the MBCA. The Complaint does not allege that any of the transfers made by any of the Venture Debtors were made "in respect to the corporation's shares." Nor does the Complaint allege facts from which the Court could draw such a conclusion.

The MBCA does not define the phrase "in respect to the corporation's shares." But at least one case has suggested that the phrase means "in recognition of" share ownership. *See Frank v. Zerat* (*In re Peet Packing Co.*), 231 B.R. 42, 44 (Bankr. E.D. Mich. 1999).

The Court cannot conclude, at this stage, that any of the transfers were made in recognition of any share ownership by Winget in any of the Venture Debtors, even if Defendants *could* show that Winget was a shareholder of one or more of the Venture Debtors. Rather, the most the Court could conclude is that the transfers were made for the benefit of, and did benefit, Larry Winget,

28

who, the Complaint also alleges, was "at various material times the Chief Executive Officer of the Debtors and . . . a director of each of the Debtors."[105]

Assuming that Defendants could show that Winget was also a "shareholder" of one or more of the Venture Debtors, it would be insufficient under the definition of "distribution" to show merely that the transfers were made to or for the benefit of such shareholder. That is one requirement in the MBCA's definition of "distribution," but the definition also requires that the transfers be made "in respect to the corporation's shares."

Defendants' interpretation of the definition of "distribution" would, in effect, require the Court to ignore the statutory language "in respect to the corporation's shares." It would read that phrase out of the statute. That would be contrary to rules of statutory interpretation under Michigan law, which state that a court "should presume that every word [in a statute] has some meaning and should avoid any construction that would render a statute, or any part of it, surplusage or nugatory." *Estes v. Idea Engineering & Fabrications, Inc.*, 649 N.W.2d 84, 90 (Mich. Ct. App. 2000)(citing *Altman v. Meridian Twp.*, 487 N.W.2d 155 (Mich. 1992)). "As far as possible, effect should be given to every phrase, clause, and word.*" Id.* (citing *Gebhardt v. O'Rourke*, 510 N.W.2d 900 (Mich. 1994)).

For these reasons, the Court cannot dismiss Gold's MUFTA claims in Count III based on Defendants' MBCA argument.

## B. Count XI – Defendants' argument that Gold's preference claims under Bankruptcy Code § 547 are not pled with sufficient detail

Gold seeks to avoid and recover preferential transfers under 11 U.S.C. §§ 547(b) and

---

[105] *Id*. at 4 ¶ 8.

550(a) in Count XI of the Complaint.[106]  Eight Defendants —  Venture Nevada, Pompo, VIR,

Modas, Linden Creek, GCS, WCS, and Venture Asia — seek dismissal of Count XI.  In the

alternative, these defendants move for a more definite statement under Fed. R. Civ. P. 12(e).

Defendants argue that Count XI does not meet the minimum pleading requirements of

Fed.R.Civ.P. 8(a), because the allegations in Count XI fail to provide them with "fair notice"

about the preferential transfer claims against them.

**1.  Preferential transfer allegations in Count XI of the Complaint**

The details about the preferential transfers were set forth in a three-page table, which

according to the Complaint, "summarizes the minimum preferential transfers" alleged to be

avoidable.[107]  The table did not list every transfer individually.  Rather, for each Venture Debtor

that made transfers, the table listed the total amounts transferred to each defendant, by each of the

following methods: "Wire and ZBA Transfers," "ACH," and "Checks."[108]  As to preference

defendants in this case (04-4373) who have moved to dismiss Count XI, the table listed the

following transfer totals:[109]

**Defendant Linden Creek**

| transfers by: | Wire and | Checks | Total |
|---|---|---|---|

---

[106] Compl. at 85 ¶ 551.

[107] Compl. at 86 ¶ 553.

[108] Compl. at 86 ¶ 553.

[109] In the table presented in this opinion, the Court has reorganized the information contained in the Complaint table, to group the transfers by defendant.  And the Court has added to this table, in bold, the total amount of transfers to each defendant.

The table in this opinion does not include transfers listed in the Complaint table that allegedly were made to the defendants in the severed case (04-5178).  *See* discussion in Part I-A-3 of this opinion.

|  | ZBA Transfers | | |
|---|---|---|---|
| Venture Industries (Interior) | | $ 587.84 | $ 587.84 |
| Venture Service | | $ 53,030.00 | $ 53,030.00 |
| Venco | | $ 4,583,918.36 | $ 4,583,918.36 |
| **Total for this Defendant** | | | **$ 4,637,536.20** |

**Defendant Modas**

| transfers by: | Wire and ZBA Transfers | Checks | Total |
|---|---|---|---|
| Venture Industries (Interior) | $258,510.00 | $ 1,930,007.74 | $ 2,188,517.74 |
| Venture Mold & Engineering | | $ 92,559.92 | $ 92,559.92 |
| Venco | | $ 59,000.00 | $ 59,000.00 |
| **Total for this Defendant** | | | **$ 2,340,077.66** |

**Defendant Venture Asia Pacific**

| transfers by: | Wire and ZBA Transfers | Checks | Total |
|---|---|---|---|
| Venture Mold & Engineering | $ 14,941.83 | | $ 14,941.83 |
| **Total for this Defendant** | | | **$ 14,941.83** |

**Defendant VIR Company**

| transfers by: | Wire and ZBA Transfers | Checks | Total |
|---|---|---|---|
| Venture Mold & Engineering | $ 12,000.00 | | $ 12,000.00 |
| **Total for this Defendant** | | | **$ 12,000.00** |

**Defendant Winget Construction**

| transfers by: | Wire and ZBA Transfers | Checks | Total |
|---|---|---|---|
| Venture Holdings (Bailey) | | $ 146,073.78 | $ 146,073.78 |
| **Total for this Defendant** | | | **$ 146,073.78** |

**Defendant Golf Course Services, LLC**

| transfers by: | Wire and ZBA Transfers | Checks | Total |
|---|---|---|---|
| Venture Service | | $ 80,998.97 | $ 80,998.97 |
| **Total for this Defendant** | | | **$ 80,998.97** |

31

Count XI also contained general allegations that mirrored the statutory language of

§ 547(b).[110]  With regard to the time period in which the transfers were made, the Complaint

alleged only that the transfers were "made on or between ninety days and one year before the

Petition Date to an insider[.]"[111]

In support of Gold's recovery claim under § 550(a), the Complaint alleged that "[e]ach

Corporate Defendant . . . identified in the [table] was the initial transferee of each such transfer

pursuant to 11 U.S.C. § 550(a)(1)."[112]  And it alleged that "[s]ome or all of the Defendants herein

were either: (a) entities for whose benefit such transfers were made; or (b) the immediate or

---

[110]  Subject to certain exceptions, Section 547(b) states in relevant part that

> the trustee may avoid any transfer of an interest of the debtor in property —
>
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made —
>> (A) on or within 90 days before the date of filing of the petition;
>> (B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if —
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

[111] Compl. at 86 ¶ 552(e).

[112] *Id.* at 88 ¶ 554.

mediate transferees of the initial transferees."[113]

The Complaint demanded judgment "in an amount subject to proof at trial but not less than the amounts set forth herein."[114]

## 2. Defendants' arguments

Defendants argue that to state a valid preference claim, Gold was required to allege certain facts about each individual transfer. In support of their position, the Defendants rely on *TWA, Inc. v. Marsh USA, Inc.*, *(In re TWA Inc. Post-Confirmation Estate)*, 305 B.R. 228 (Bankr. D. Del. 2004), *Valley Media, Inc., v. Borders, Inc.*, *(In re Valley Media, Inc.)*, 288 B.R. 189 (Bankr. D. Del. 2003), and *Lomas Financial Corp., v. Posman* (*In re Posman*), 1999 WL 33742299 (Bankr. D. Del. July 28, 1999). These cases hold that a valid preference claim must contain the following information in order to overcome a Rule 12(b)(6) motion:

> (a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of the debtor/transferor, (iii) name of transferee, and (iv) the amount of the transfer.

*In re TWA Inc. Post-Confirmation Estate*, 305 B.R. at 232 (citing *Valley Media*, 288 B.R. at 192 (citing *In re Posman*, 1999 WL 33742299, at *2)). The courts in the *TWA*, *Valley Media* and *Posman* cases each found that the complaint failed to comply with these pleading requirements because their allegations pled the total aggregate amounts for transfers that occurred during the 90 day preference period instead of allegations specific to each transfer. In each of these cases, the court granted the dismissal motion, but allowed plaintiffs to file amended complaints to

---

[113] *Id.* at 88 ¶ 555.

[114] *Id.* at 89.

33

provide the required information.

Gold contends that the defendants were provided with "fair notice" of the preference claims as required by Civil Rule 8(a). Gold argues that the "heightened pleading" standard established in *Valley Media* and similar cases should be rejected. He relies on *Ice Cream Liquidation, Inc. v. Calip Dairies, Inc. (In re Ice Cream Liquidation, Inc.)*, 319 B.R. 324 (Bankr. D. Conn. 2005); *Neilson v. Sheri Southern* (*In re Webvan Group*, *Inc.*), 2004 WL 483580 (Bankr. D. Del. March 9, 2004); and *Family Golf Centers*, *Inc.*, *v. Acushnet Company and Fortune Brands*, *Inc.* (*In re Randall's Island Family Golf Centers*, *Inc.*), 290 B.R. 55 (Bankr. S.D.N.Y. 2003). In these cases, the courts declined to follow *Valley Media.*

The Defendants in the severed adversary proceeding (No. 04-5178) made the very same argument as the Defendants here, and this Court rejected the argument. *See Gold v. Nova Industries, Inc. (In re NM Holdings Co., LLC)*, 376 B.R. 194, 202-04 (Bankr. E.D. Mich. 2007). In that case, this Court held that the same Complaint and Count XI at issue in this case, but as applied to different defendants, met the liberal pleading requirements of Civil Rule 8(a). And this Court held that the "heightened pleading requirements imposed by the *Valley Media* case [were] inconsistent with the liberal notice pleading principles underlying the civil rules" and Sixth Circuit precedent. *Gold v. Nova Industries, Inc.,* 376 B.R. at 204 (citing *Miller v. American Heavy Lift Shipping*, 231 F.3d 242 (6th Cir. 2000)), and agreeing with the reasoning in *IT Group v. Brandywine Apts. (In re IT Group),* 313 B.R. 370, 373 (Bankr. D. Del. 2004) and *Family Golf Centers*, *Inc. v. Acushnet Company and Fortune Brands*, *Inc.* (*In re Randall's Island Family Golf Centers*, *Inc.*), 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003)).

The Court holds that the preference allegations in Count XI of the Complaint satisfy the

34

liberal pleading standards of Civil Rule 8. The Court adopts its reasoning and holding from *Gold v. Nova Industries, Inc.*, including the following:

> Considering all of the relevant allegations in the Original Complaint and drawing all reasonable inferences in favor of the Trustee, the Court finds that the Original Complaint contained "a 'short and plain statement of the claim' that gave Defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. at 47 (*citing* Rule 8(a)(2), 28 U.S.C.A.). . . .
>
> The Original Complaint informed Defendants that Plaintiffs sought to avoid and recover preferential transfers under 11 U.S.C. §§ 547(b) and 550(a). Through the allegations set forth in a table, the Original Complaint identified (1) the name of each debtor/transferor; (2) the name of each defendant/transferee; (3) the form of transfers (checks); and (4) the total amount of the alleged preferential transfers made by a particular debtor/transferor to each defendant/transferee. This provided ample and fair notice to each of the Defendants of "what the plaintiff's claim is and the grounds upon which it rests," as required by *Conley v. Gibson.* And Defendants were not unduly hindered in their ability to file an answer and to assert any pertinent affirmative defenses. Further, to the extent Defendants were unable to *fully* defend themselves or *fully* assert possible defenses because of any details missing from the Original Complaint, the Civil Rules gave them ways to cope with the problem. Defendants could seek full details about the transfers in discovery, and then amend their answers if necessary. The Court concludes that the Original Complaint met the liberal pleading requirements of Civil Rule 8(a).

*Gold v. Nova Industries, Inc.*, 376 B.R. at 204 (italics in original).

The Court's holding is consistent with recent Supreme Court cases. *In Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court discussed the notice pleading standard of Civil Rule 8(a)(2). As explained by the Supreme Court,

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . .

claim is and the grounds upon which it rests[.]". . . **While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . .** a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (emphasis added, citations omitted). *See also Erickson v. Pardus*, 551 U.S. 89 (2007) (explaining that Fed.R.Civ.P. 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary[.]"))

### C. Counts III, IV, and V – Defendants' arguments that Gold's fraudulent transfer claims are not pled with particularity as required by Fed.R.Civ.P 9(b)

Many of the Defendants in Case No. 04-4373 move for dismissal of Counts III, IV, and V of the Complaint. These counts allege intentional and constructive fraudulent transfer claims under the Bankruptcy Code and Michigan law. As used in this opinion, an "intentional fraudulent transfer" is one in which an element of the claim is that the transfer was made "with actual intent to hinder, delay, or defraud" a creditor. *See* 11 U.S.C. § 548(a)(1)(A); Mich. Comp. Laws Ann. § 566.34(1)(a). A "constructive fraudulent transfer" claim, on the other hand, includes no such intent element. *See* 11 U.S.C. § 548(a)(1)(B); Mich. Comp. Laws Ann. §§ 566.34(1)(b), and 566.35.[115]

Defendants contend that all the fraudulent transfers claims in Counts III, IV, and V fail to

---

[115]  The Michigan fraudulent transfer statutes are quoted in full in Part V-A of this opinion, at footnote 93.

plead fraud with particularity as required by Fed.R.Civ.P. 9(b).[116]  According to the Defendants,

Rule 9(b) applies to both intentional and constructive fraudulent transfer claims.  To satisfy Rule

9(b)'s pleading standard, Defendants contend that Gold must allege specific "times, places, and

contents of the underlying fraud," citing *Ullmo v. Gilmour Academy*, 273 F.3d 671, 678 (6th Cir.

2001).

Gold disagrees.  He notes that the Rule 9(b) pleading standard urged by the Defendants is

typically applied to claims of common law fraud, and argues that such a pleading standard does

not apply to fraudulent transfer claims.  In the alternative, Gold argues that even if Rule 9(b)

applies to intentional fraudulent transfer claims, it does not apply to constructive fraudulent

transfer claims.[117]

### 1.  General requirements of Rule 9(b)

Fed.R.Civ.P. 9(b), applicable to this adversary proceeding under Fed.R.Bankr.P. 7009,

states:

> In alleging fraud or mistake, a party must state with particularity
> the circumstances constituting fraud or mistake.  Malice, intent,
> knowledge, and other conditions of a person's mind may be alleged
> generally.

The Sixth Circuit has instructed courts to apply Rule 9(b) keeping in mind the liberal pleading

---

[116]  *See* Br. in Supp. of "Defendants Larry J. Winget, Sr., Venture Nevada LLC, Pompo Insurance
& Indemnity Company, Ltd., VIR Company LLC and Modas LLC's Combined Motion to Dismiss in Part
the Adversary Complaint" at 14-17 (Docket # 129); Br. in Supp. of "N. Matthew Winget and Linden
Creek Enterprises, LLC's Motion [to] Dismiss the Complaint in Part" at 5-7 (Docket # 106); Br. in Supp.
of "Alicia J. Winget; Brian P. Winget; Adelicia J. Tignanelli; Gwendolyn Cameron; Golf Course
Services, LLC; and Winget Construction LLC's Motion to Dismiss Adversary Complaint" at 6-8 (Docket
# 118); Br. in Supp. of "Venture Industries Australia, Pty. Ltd's and Venture Asia Pacific, Pty. Ltd.'s
Motion to Dismiss" at 5-7 (Docket # 134).

[117]  Comm.'s Br. in Supp. at 15 (Docket # 163).

approach of Civil Rule 8. In *Michaels Bldg. Co.,* 848 F.2d 674, 679 (6th Cir. 1988), the court stated:

> In ruling upon a motion to dismiss under Rule 9(b) for failure to plead fraud "with particularity," a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8. Rule 8 requires a "short and plain statement of the claim" and calls for "simple, concise, and direct" allegations. Indeed, Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather the two rules must be read in harmony. Thus, it is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.

(citations omitted). "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *United States v. Bledsoe*, 501 F.3d 493, 503 (6th Cir. 2007). The goals of Rule 9(b) are: (1) to "ensure[] that defendants have the specific notice necessary to prepare a response[;]" (2) to "prevent[] prospective plaintiffs from engaging in a fishing expedition to uncover moral wrongs[;]" and (3) "to protect defendants' reputations against damage stemming from accusations of immoral conduct." *Bledsoe,* 501 F.3d at 503 n.11 (citing *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1107, 1036 n.25 (4th Cir. 1997)(quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997)).

More recently, the Sixth Circuit described Rule 9(b)'s requirements as follows:

> In our recent decision in *Bledsoe II*, we reiterated our long-standing holding that, under Rule 9(b), a plaintiff must 'allege the time, place, and content of the alleged misrepresentation . . . the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' As *Bledsoe II* also made clear,

38

> however, this requirement should be understood in terms of Rule
> 9(b)'s broad purpose of ensuring that a defendant is provided with
> at least the minimum degree of detail necessary to begin a
> competent defense. 'Essentially, a complaint should provide fair
> notice to [d]efendants and enable them to "prepare an informed
> pleading responsive to the specific allegations of fraud."

*United States ex rel SNAPP, Inc. v. Ford Motor Co*., 532 F.3d 496, 504 (6th Cir. 2008) (quoting

*United States ex rel Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 504 (6th Cir. 2007))

(internal citations omitted).

The requirements of Rule 9(b) may be relaxed when a plaintiff alleges facts particularly

within the knowledge of the defendant. *Michaels Bldg. Co. v. Ameritrust Co*., 848 F.2d at 680

(citations omitted). This principle has been applied in bankruptcy cases when a trustee is

bringing the claim and as such is considered to be a "third party outsider to the allegedly

fraudulent transaction which, initially, has only second hand information upon which to rely in

framing issues." *Official Committee of Unsecured Creditors, Inc. v. Asea Brown Boveri, Inc.* (*In*

*re Grand Eagle Cos., Inc*.), 288 B.R. 484, 495 (Bankr. N.D. Ohio 2003) (citations omitted).

**2. Rule 9(b) does not apply to constructive fraudulent transfer claims.**

The Sixth Circuit has not yet addressed whether the particularity requirement of Rule 9(b)

applies to fraudulent transfer claims. A few courts have held that Rule 9(b) does apply to

constructive fraudulent transfer claims. *See, e.g., OHC Liquidation Trust v. Nucor Corp.* (*In re*

*Oakwood Homes Corp*.), 325 B.R. 696, 698 (Bankr. D. Del. 2005); *Kleven v. Norkus* (*In re*

*Chochos*), 325 B.R. 780, 783 (Bankr. N.D. Ind. 2005). Most cases have held that Rule 9(b) does

not apply to such claims. *See, e.g., State Bank & Trust Co. v. Spaeth* (*In re Motorwerks, Inc.*),

371 B.R. 281, 295 (Bankr. S.D. Ohio 2007); *Brandt v. Trivest II, Inc.* (*In re Plassein Int'l.*

*Corp.*), 352 B.R. 36, 40 (Bankr. D. Del. 2006). These cases reason that constructive fraudulent

transfer claims

> do not necessarily require proof that the defendant engaged in some
> form of deceit, misrepresentation or fraudulent activity. In fact, a
> fraudulent transfer claim based on constructive fraud need only
> allege that the transfer was made without reasonably equivalent
> value while the debtor was insolvent. In other words, there is no
> reason to require a trustee to plead a defendant's fraud or
> misconduct with specificity if such fraud or misconduct is not an
> element of the trustee's fraudulent transfer claim.

*Motorwerks*, 371 B.R. at 295 (citing *Giuliano v. U.S. Nursing Group (In re Lexington*

*Healthcare Group, Inc.*), 339 B.R. 570, 574-75 (Bankr. D. Del. 2006) (internal citations

omitted)); *see also Plassein Int'l. Corp.*, 325 B.R. at 40; *Sharp Int'l Corp. v. State Street Bank*

*(In re Sharp Int'l Corp)*, 281 B.R. 506, 518 (Bankr. E.D.N.Y. 2002). In holding that Rule 9(b)

does not apply to constructive fraudulent transfer claims, one court has reasoned that:

> When "fraud" is alleged solely because a debtor transferred
> property while it was insolvent, the transferee is not accused of an
> act of fraud or deception; indeed, other than receiving the transfer,
> the conduct and mental state of the transferee is irrelevant. It is the
> debtor, if anyone, who is charged with transferring property in
> "fraud" of its creditors. Fraudulent transfer actions alleging
> "constructive fraud" often seek to recover transfers from innocent
> third parties. Thus, the policy that a defendant should have notice
> of the precise act or conduct that is being questioned as fraudulent
> so that it may adequately defend itself from such loathsome
> accusations and preserve its reputation is not implicated when there
> is no allegation that the transferee committed an act of fraud. With
> respect to the issue of insolvency of the debtor, a general allegation
> of insolvency provides a defendant fair notice of the plaintiff's
> contention and renders sufficient information from which a
> defendant may create discovery requests in order to defend, as in
> any civil action. A transferee need not "defend its honor" against
> the accusation that the debtor was or became insolvent when the
> transferee's knowledge or intent as to the debtor's insolvency is not
> an element of the fraudulent transfer claim.

*Sharp v. Chase Manhattan Bank, N.A.* (*In re Commercial Fin. Servs., Inc.*), 322 B.R. 440, 450-51 (Bankr. N.D. Okla. 2003).

The Court agrees with the reasoning of these cases, and holds that Rule 9(b) does *not* apply to constructive fraudulent transfer claims.

### 3. Rule 9(b) does apply to intentional fraudulent transfer claims.

As Defendants point out, Counts III and IV appear to include intentional fraudulent transfer claims under 11 U.S.C. § 548(a)(1)(A)[118] and Mich. Comp. Laws Ann. § 566.34(1)(a).[119] The parties dispute whether these intentional fraudulent transfer claims are pled with sufficient particularity under Rule 9(b).

Many cases have held that Rule 9(b) applies to intentional fraudulent transfer claims. *See, e.g., Sharp Int'l Corp. v. State Street Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005) (Rule 9(b) applies to Chapter 11 debtor's intentional fraudulent transfer claim under New York Uniform Fraudulent Conveyance Act); *Musical Holding Corp. v. Best Buy Co., Inc.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 777 (Bankr. S.D.N.Y. 2008) (intentional fraudulent transfer claim based on Minnesota law must comply with Rule 9(b));

---

[118]  Bankruptcy Code section 548(a)(1)(A) states that:

> a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such a transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A).

[119]  This section of Michigan's Uniform Fraudulent Transfer Act is quoted in Part V-A of this opinion, at footnote 93.

*Morris v. Zelch* (*In re Regional Diagnostics, LLC*), 372 B.R. 3, 17 (Bankr. N.D. Ohio 2007) (plaintiff is required to "state with particularity the circumstances constituting fraud according to the requirements imposed by rule 9(b)" when he alleges a fraudulent transfer based on actual fraud); *Campbell v. Cathcart* (*In re Derivium Captial, LLC*), 380 B.R. 407, 422 (Bankr. D.S.C. 2006) ("A claim for actual fraudulent transfer pursuant to § 548(a)(1)(A) must satisfy the particularity requirements of Fed.R.Civ.P. 9(b)."); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. American Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 459 (Bankr. S.D.N.Y. 2006) (intentional fraudulent transfer claims under § 548(a)(1)(A) and applicable state law must satisfy the pleading requirements of Rule 9(b)); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 315 (Bankr. S.D.N.Y. 1999) (same).

The Court agrees with these cases, to the extent they apply Rule 9(b) to intentional fraudulent transfer claims that are premised on a transferor-debtor's "actual intent to defraud."

Under both 11 U.S.C. § 548(a)(1)(A) and Mich. Comp. Laws Ann. § 566.34(1)(a), one of the elements of Gold's intentional fraudulent transfer claims is that the Debtors made the transfer(s) with the "actual intent to hinder, delay, or defraud" its creditors. The required intent may be any one or more of the following: (1) to hinder, (2) to delay, or (3) to defraud. As one bankruptcy treatise explains:

> The three intents that the transferor can form—hinder, delay or defraud—are distinct elements, any one of which is sufficient to render the transaction fraudulent. Thus, an intent merely to delay, but not ultimately prevent, a creditor from being repaid is generally sufficient to trigger the requisite culpability required by [§ 548(a)(1)(A)].

5 *Collier on Bankruptcy*, ¶ 548.04[1] at 548-23 (15th ed. rev. 2008); *see also Shapiro v. Wilgus*,

287 U.S. 348, 354 (1932)(applying the Pennsylvania version of Uniform Fraudulent Conveyance Act, and holding that "[a] conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them."); *Leonard v. Coolidge (In re Nat'l Audit Defense Network)*, 367 B.R. 207, 221-22 (Bankr. D. Nev. 2007)(same)(applying Bankruptcy Code § 548(a)(1)(A) and Nevada's UFTA); *Flushing Savings Bank v. Parr*, 438 N.Y.S.2d 374, 376 (N.Y. App. 1981), (same)(applying New York version of Uniform Fraudulent Conveyance Act).

When a plaintiff alleges that a debtor transferred property with actual intent to hinder or delay a creditor, but does not allege an actual intent "to defraud" a creditor, the claim is not one of actual fraud. In this situation, Rule 9(b) does not apply, and a plaintiff's complaint need only satisfy the pleading requirements under Rule 8(a). But when a plaintiff's intentional fraudulent transfer claim is premised on a debtor's actual intent "to defraud," Rule 9(b) does apply, and the plaintiff must plead the "circumstances constituting fraud" with particularity.

In order to meet this requirement in this context, a plaintiff must allege the following, for each transfer:

- the date of the transfer;

- the amount of the transfer (or if the transfer was of property other than money, the property that was transferred and its value);

- the name of the transferor;

- the name of the initial transferee; and

- the consideration paid, if any, for the transfer.

*See Official Comm. Of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase*

*Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 733, 734 (Bankr. S.D.N.Y. 2008)(complaint must "specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, [and] the consideration paid," as well as the identity of the transferee)(quoting *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp.2d 198, 221 (S.D.N.Y. 2002)). "Allegations that a debtor made an aggregate amount or series of cash or other transfers over a period of time, without further particularization, are insufficient to state an intentional fraudulent transfer claim." *Id*. at 733 (collecting cases). "However, Rule 9(b)'s requirement is not intended to be an insurmountable hurdle for claimants to overcome; the complaint must give the party adequate notice of the charges—it need not marshall all of the evidence against him." *Sharp v. Chase Manhattan Bank USA, N.A.* (*In re Commercial Fin. Servs., Inc.*), 322 B.R. 440, 448 (Bankr. N.D. Okla. 2003) (internal quotation marks and citations omitted).

To the extent Gold's complaint does not meet the above requirements, it does not satisfy Rule 9(b) merely by alleging a number of so-called "badges of fraud," as Gold argues. Rather, a plaintiff relies on "badges of fraud" as evidence of the transferor-debtor's fraudulent *intent*. *See Sumpter v. United States*, 302 F.Supp.2d 707, 723 (E.D. Mich. 2004)(explaining that because the actual intent of a transferor is difficult to establish with direct evidence, the courts developed a list of "badges of fraud" to prove a debtor's fraudulent intent);[120] Mich. Comp. Laws Ann.

---

[120] "Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." *United States v. Leggett*, 292 F.2d 423, 426 (6th Cir. 1961), *cert. denied*, 368 U.S. 979 (1962).

> The "badges of fraud" have been found to include inadequacy of consideration, secret or hurried transactions not in the usual mode of doing business, and the use of dummies or fictitious parties. . . .

44

§ 566.34(2).[121]  While "badges of fraud" may help establish the fraudulent intent of a debtor, such fraudulent intent may be pled *generally* under Fed.R.Civ.P. 9(b).  *See* Fed.R.Civ.P. 9(b)("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")  It is not the fraudulent intent of the debtor that must be pled with particularity; rather it is the "circumstances constituting fraud."  And such circumstances include the particular details listed above, as to each transfer.

---

> Reservation of benefits, control or dominion of property by the debtor, insolvency of the debtor, and the pendency or threat of litigation at the time of the transfer are other badges of fraud. . . . A concurrence of several badges of fraud will always make out a strong case. . . . Transactions between family members affecting the rights of creditors are generally subjected to close scrutiny.

*Sumpter v. U.S.,* 302 F.Supp.2d at 723 (internal quotation marks and citations omitted).

[121]  Under the Michigan fraudulent transfer statute, such badges of fraud are listed as factors a court may consider "in determining actual intent"of the transferor under the "actual intent to hinder, delay, or defraud" provision in Mich. Comp. Laws Ann. § 566.34(1)(a).  These factors  are "whether 1 or more of the following occurred:"

> (a) The transfer or obligation was to an insider.
> (b) The debtor retained possession or control of the property transferred after the transfer.
> (c) The transfer or obligation was disclosed or concealed.
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> (e) The transfer was of substantially all of the debtor's assets.
> (f) The debtor absconded.
> (g) The debtor removed or concealed assets.
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mich. Comp. Laws Ann. § 566.34(2).

### 4. Application of Rule 9(b) to Counts III and IV

According to the Defendants, Gold's intentional fraudulent transfer allegations do not satisfy Rule 9(b) because (1) Gold alleges only aggregate amounts of transfers; (2) Gold does not specify the name of the Debtor that made each of the transfers; rather, the Complaint generally lumps all of the Debtors together as transferors; (3) a single allegation covers the total amount transferred for a six year period of time; and (4) Gold does not allege the specific transfer dates and amounts.

The Court agrees with the Defendants, to the extent Gold's intentional fraudulent transfer claims are premised on the transferor-Debtor(s)'s "actual intent to defraud." Counts III and IV of the Complaint incorporate by reference all of the 471 paragraphs pled in the "Background" and "General Allegations" sections of the Complaint. Allegations within the "General Allegations" section are separately pled against each Defendant. The Complaint names the Defendant alleged to be the transferee of fraudulent transfers made by "the Debtors." And the Complaint specifies the form of many of the transfers, such as payments under management and commission fee agreements; the (over)payment of health insurance or self-insured workers' compensation insurance; intra-company loans; and real estate or equipment lease (over)payments. For each of the Defendants, however, the Complaint fails to state the specific name of the transferor, the transfer date(s), and each of the transfer amount(s). Instead, the identity of a transferor is pled as being "the Debtors" or "one or more of the Debtors," (there are eleven "Debtors");[122] a transfer

---

[122] *See* Compl. at ¶¶ 21-23; 29-36; 74; 76; 78; 80; 81; 83; 85; 100; 103; 119; 121; 143-144; 158; 160-61; 164; 179; 181; 197-99; 201; 218; 220-21; 224; 239-40; 244; 280; 282; 298; 302; 314-15; 332-34; 336-37; 354-56; 387; 389; 400-04; 422; 427-30; 438; 443; 446; 448; 451-52; 463-64; 466-67 (Docket #1).

date is specified only as occurring "within six years prior to the Petition Date;"[123] and the amount of a transfer(s) at issue is pled only in the aggregate, with amounts that range from $65,000 to a high of $314.5 million.[124]

The Court concludes that the intentional fraudulent transfer allegations in Counts III and IV of Gold's Complaint fail to satisfy the pleading requirements of Rule 9(b), to the extent such allegations are premised on any of the Debtors' "actual intent to defraud," rather than on their actual intent to "hinder" or "delay." Absent amendment of Gold's Complaint, such claims must be dismissed.

Gold has requested leave to file an amended complaint, if the Court determines that the Complaint is deficient. Fed.R.Civ.P. 15(a) provides that "the court should freely give leave [to amend] when justice so requires." The Court will grant Gold leave to amend his Complaint within 30 days, including leave to conform to the Rule 9(b) requirements described in this opinion.

### D. Counts III, IV and V – Defendants' statute of limitations arguments

Defendants Larry J. Winget, Sr., Venture Nevada, LLC, Pompo Insurance & Indemnity Company, Ltd., VIR Company, LLC and Modas LLC seek dismissal of "many" of the claims for avoidance and recovery of fraudulent transfers in Plaintiff's Complaint, brought under 11 U.S.C. §§ 544, 548, and 550 (Counts III, IV, and V), based on the statute of limitations. As explained

---

[123] *See* Compl. at ¶¶ 31-36; 74; 76; 78; 141-43; 197-98; 239-41; 280; 282; 334-36; 354; 401; 427-28; 438; 446; 448; 464; 466 (Docket #1).

[124] *See* Compl. at ¶¶ 30-35; 55; 65; 74; 76; 78; 80-81; 83; 100; 102; 119; 141; 143; 161; 163; 197-99; 221; 223; 239-42; 280; 282; 298; 314; 334; 336; 354; 401; 403; 427-29; 438; 446; 448-49; 451; 454; 464; 466 (Docket #1). There are only two paragraphs in the Complaint that contain specific allegations about a specific fraudulent transfer's amount and date. *See id. at* ¶¶ 179 and 463.

below, the Court concludes that none of the claims in Counts III, IV or V are barred by the statute of limitations.

Defendants argue that Gold's claims to avoid fraudulent transfers are barred in large part by the applicable statute of limitations, because the transfers were made under contracts executed outside of the limitations period.[125] Defendants argue, with some caselaw support, that when payments are made under a contract, the date the contract was executed and delivered, and not the date of each payment, begins the running of the statute of limitations for all payments.

Gold argues, for several reasons, that none of the transfers he is seeking to avoid in Counts III, IV, and V were made outside the applicable limitations period.[126] The Court will address the parties' arguments in the context of the three counts of the Complaint at issue.

### 1. Count III

Count III seeks avoidance and recovery of various alleged fraudulent transfers of money that Debtors made "within six years prior to the [bankruptcy] Petition Date." This Count is based on 11 U.S.C. §§ 544 and 550, and Mich. Comp. Laws Ann. §§ 566.34, 566.35, and 566.38.[127] As will be seen, none of the transfers Gold seeks to avoid in Count III were made outside the applicable statute of limitations.

####    a.    A six-year statute of limitations applies to Gold's fraudulent transfer claims in Count III, and runs from the time each transfer is made.

---

[125] *See* Defs.' Br. in Supp. of Combined Mot. To Dismiss in Part the Adv. Compl. (Docket # 129) at 9-14.

[126] *See* Objection by Official Committee of Unsecured Creditors to Mot. to Dismiss the Adv. Compl. in Part (Docket # 163) at 10-14.

[127] Compl. at 71-75 ¶¶ 492-502 (emphasis added).

48

Under § 544(b), Gold can avoid transfers made and obligations incurred as follows:

> (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable **under applicable law** by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1)(emphasis added).

"Applicable law" here is Michigan law, specifically Mich. Comp. Laws Ann. §§ 566.34 and 566.35, Michigan's Uniform Fraudulent Transfer Act. These statutes are quoted in Part V-A of this opinion.

The limitations period for a fraudulent transfer claim under these statutes is 6 years after the claim "accrues." *See* Mich. Comp. Laws Ann. §§ 566.39(a); 600.5813. Mich. Comp. Laws Ann. § 600.5827 states, in pertinent part, that a claim "accrues" "at the time the wrong upon which the claim is based was done regardless of the time when damage results." Under §§ 566.34 and 566.35, the making of a fraudulent transfer is the "wrong" upon which the claim is based, so the date of the transfer is the date the fraudulent transfer claim "accrues." *See Americorp Fin. Group, Inc. v. Powerhouse Licensing, L.L.C.*, No. 271189, 2007 WL 189374, * 3-4 (Mich. Ct. App. Jan. 25, 2007)(unpublished).

Therefore, under Mich. Comp. Laws Ann. §§ 566.34 and 566.35, Gold may seek to avoid fraudulent transfers made up to six years before the Debtors' March 28, 2003 bankruptcy petition date.[128]

---

[128] At first blush, one might think that the look-back period is six years from the date of filing the adversary complaint, rather than six years from the filing of Debtors' bankruptcy petitions. But there is case law supporting the latter view, and Defendants have not argued otherwise. Courts have held that as long as the trustee's complaint is timely filed under 11 U.S.C. § 546(a), as in this case, that section has

### b. Avoidance of transfers that were payments made within the limitations period, but made under contracts executed outside the limitations period, is not barred by the statute of limitations.

Defendants argue that to the extent Count III seeks to avoid transfers that were payments made within the 6-year limitation period, but made under contracts that were executed outside that limitation period, the claim is time-barred. The Court disagrees.

In support of their argument, Defendants rely primarily on *Le Café Creme Ltd. v. Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221 (Bankr. S.D.N.Y. 2000). In that case, on November 19, 1997, the debtor sought to avoid and recover, as fraudulent transfers under §§ 542, 544(b), 548, 550(a) and 551, payments the debtor made to two of its shareholders. The payments were made under an agreement to repurchase shares of stock from the shareholders, and to reaffirm a loan obligation to the shareholders ("Purchase Agreement"). *Id.* at 226-27. The Purchase Agreement was made on February 4, 1994. *Id.* at 227. Under the Purchase Agreement, part of the purchase price was to be paid at the closing, part was to be paid within two weeks of closing, and the balance was to be paid in later installments. *Id.* at 229. At the same time the debtor executed the Purchase Agreement, the debtor also executed a promissory note in the amount of $150,000, a security agreement granting the defendants a lien upon all of the furnishings, equipment, and fixtures of the debtor, and a financing statement. *Id.*

The defendants argued, in part, that the debtor's claims under § 548 were time barred because "the determinative transfer is not when the [p]ayments were made, but when the

---

the effect of tolling the running of the state statute of limitations for avoidance claims under § 544(b), as long as the claims were not already time-barred under state law as of the petition date. *See, e.g., Lassman v. Burgess Constr. Servs., Inc.* (*In re Sears Petroleum & Transp. Corp.*), 417 F. Supp. 2d 212, 223, 225-26 (D. Mass. 2006); *Mahoney, Trocki & Associates v. Kunzman* (*In re Mahoney, Trocki & Assocs., Inc.*), 111 B.R. 914, 919 (Bankr. S.D. Cal. 1990).

Purchase Agreement was executed," and this transfer occurred on February 4, 1994, beyond the

one year look-back period then applicable to § 548 claims. *Id*. at 233, 237. The court agreed

with the defendants that the relevant date, for purposes of the § 548 one year look-back period,

was the date the contract was executed, and not the date when the payments were made under the

contract. The court stated that "the [d]ebtor transferred its interest in its property when it

executed the Purchase Agreement and not when it made each installment payment." *Id.* at 238.

The court explained that

> the [d]ebtor's obligation to pay the [defendants] for their full
> performance, albeit in the form of installments, arose upon
> execution of the Purchase Agreement and related documents. The
> [d]ebtor's installment payments are not divisible transfers of the
> [d]ebtor's interest in property, separate from the [d]ebtor's
> execution of the Purchase Agreement and the granting of the
> [defendants'] security interest in the [d]ebtor's furniture and
> fixtures.

*Id.* at 234. The court explained further that in order to determine when an obligation is incurred,

a court must determine the nature of the contract and if the contract is "divisible" or

"indivisible:"

> "If the contracted for performance is an entire indivisible unit,
> courts have held that the payment obligation is deemed to arise
> upon completion of performance. If the contracted for performance
> is inherently divisible or of an on-going requirement nature, courts
> have held that the debt is incurred incrementally upon receipt of
> services. (citations omitted). From these cases, it appears that the
> courts, in line with business practices, look to see the nature of the
> contract and of the debt in determining when a debt arises. A
> contract is divisible if the 'performance by each party is divided
> into two or more parts' and such performance is the 'agreed upon
> exchange for a corresponding part of the other party.' (quoting
> RESTATEMENT (SECOND) OF CONTRACTS § 265 Comments
> a, d (1979)). If it is so divisible or if the debt arises in quantum
> meruit, a debtor is likely to be viewed as having made payment for

> each of the benefit [sic] conferred. But if the contracted for
> performance is an indivisible unit or if the debt lies in contract,
> then full payment of a debt is to be considered as a payment of the
> full contractual obligation rather than payment for a series of
> partial performances."

*Id.* at 234 (quoting *Scherling v. Texaco International Trade, Inc.* (*In re Transpacific Carriers Corp.*), 50 B.R. 649, 652 (Bankr. S.D.N.Y. 1985)).

Under *Café Creme*, fraudulent transfer claims to avoid payments made within an applicable statute of limitations period, but made under an "indivisible" contract executed outside of the limitations period, are time-barred.

The holding in *Wells v. Sleep* (*In re Michigan Machine Tool Control Corp.*), 381 B.R. 657, 668 (Bankr. E.D. Mich. 2008), a recent case in this district, appears to adopt this view, although the *Wells* court did not cite *Café Creme*. In *Wells,* the trustee filed an adversary complaint seeking to avoid, as fraudulent transfers under § 544, and Mich. Comp. Laws Ann. §§ 566.34 and 566.35, payments the debtor made to three of its shareholders to redeem their stock. The debtor redeemed the defendants' stock on March 1, 1998, according to the terms of a Buy-Sell Agreement the defendants executed when the company was formed. The Buy-Sell Agreement provided that the debtor had the option to pay the stock redemption price "in a single lump sum" or to pay it "in five equal annual installments, the first installment payable at the time the endorsed stock certificates were delivered to the company, and the other installments payable pursuant to interest bearing promissory notes." *Id.* at 663. The debtor chose the second option. The debtor made an initial cash payment with interest on March 13, 1998, toward the purchase price of the stock, and issued a promissory note dated March 1, 1998 to each of the four defendants, representing the balance of the purchase price owed. The notes were payable on

52

March 1, 1999, March 1, 2000, March 1, 2001 and March 1, 2002. *Id.* The debtor paid the

principal and interest due under the promissory notes payable on March 1, 1999. However, when

the next note matured on March 1, 2000, the debtor was only able to make monthly interest

payments. Due to financial difficulties, the debtor made interest-only payments on the

promissory notes through February 2005. *Id.* at 664.

The trustee in *Wells* alleged, in part, "that the interest payments made to [the d]efendants

between January 10, 2002 and February 7, 2005 were fraudulent transfers." *Id.* at 666. The

trustee argued that each of these payments was "a separate transfer for which equivalent value

had to be given to [the d]ebtor by [the d]efendants." *Id.* at 668. The defendants countered "that

only one transfer took place – the March 1998 transfer of cash and promissory notes in exchange

for the stock." *Id.*

The court agreed with the defendants. After reviewing the meaning of the word

"transfer" under both 11 U.S.C. § 101(54) and Mich. Comp. Laws Ann. § 566.31(l), the court

stated that

> [u]nder either definition of "transfer", the only "transfer" in the
> case at bar occurred in March, 1998. Debtor disposed of an asset
> when it entered into binding contracts to redeem Defendants' stock.
> The obligations were fixed at the time Debtor signed the
> promissory notes incorporating the terms of the Buy-Sell
> Agreements. All of the payments made to Defendants between
> 1998 and 2005 were controlled by the terms of the notes (and any
> mutually agreed to subsequent modifications) issued by Debtor in
> March, 1998. Because the monthly payments made by Debtor to
> Defendants were made pursuant to valid and binding contracts
> entered into in 1998, the payments are not separate "transfers" as
> defined by Michigan law or the Bankruptcy Code.
> . . .
> Because the relevant transfer took place in March, 1998, the
> Trustee's cause of action is time-barred by MCL § 600.5813, which

> provides a 6 year statute of limitations which runs from the time a
> claim accrues.

*Id.* (footnote omitted).

The Court disagrees with both *Café Creme* and *Wells,* because they are contrary to the unambiguous language of 11 U. S. C. § 544(b) and the Michigan fraudulent transfer statutes. Section 544(b)(1) and Mich. Comp. Laws Ann. §§ 566.34 and 566.35 each provide two distinct avoidance powers:  (1) the power to avoid a "transfer" by the debtor; and (2) to power to avoid an "obligation incurred" by the debtor.

Each time one of the Debtors made a payment of money to or for the benefit of one or more of the Defendants, it made a "transfer" within the meaning of both § 544(b) and the Michigan Uniform Fraudulent Transfer Act.  The latter defines "transfer"as follows:

> (l) "Transfer" means **every mode**, direct or indirect, absolute or conditional, voluntary or involuntary, **of disposing of or parting with an asset or an interest in an asset, and includes payment of money**, release, lease, and creation of lien or other encumbrance.

Mich. Comp. Laws Ann. § 566.31(l)(emphasis added).  Similarly, as used in Bankruptcy Code § 544(b) and elsewhere in the Code,

> The term "transfer" means--
>
> (A) the creation of a lien;
>
> (B) the retention of title as a security interest;
>
> (C) the foreclosure of a debtor's equity of redemption; or
>
> (D) **each mode**, direct or indirect, absolute or conditional, voluntary or involuntary, **of disposing of or parting with**–
>
> (i) **property**; or

54

(ii) an interest in property.

11 U.S.C. § 101(54)(emphasis added).

Thus, each payment of money by a Debtor was a separate "transfer." This is so whether or not the payment was made under, or required by, a pre-existing contract, and whether or not such contract was "divisible" or not.

The *Wells* case is incorrect to the extent it holds otherwise, and the Court notes that the Sixth Circuit Bankruptcy Appellate Panel recently disagreed with *Wells*. *See Belfance v. Buonpane* (*In re Omega Door Co., Inc.*), 399 B.R. 295, 303 n.3, 304 (B.A.P. 6th Cir. 2009)(finding *Wells* "unpersuasive," and holding that under § 544(b) and Ohio fraudulent transfer statutes, the trustee could avoid both an obligation incurred and transfers related to the obligation; that each installment payment under a promissory note was a separate transfer; and that the state statute of limitations would begin to run from the date of each payment.)

Similarly, at least one other court has rejected *Café Creme*. *See Shearer v. Tepsic* (*In re Emergency Monitoring Technologies, Inc.*), 366 B.R. 476, 503 (W.D. Pa. 2007)(refusing to extend the reasoning of *Café Creme* to "a grant of, and then an execution upon, a security interest" and expressing disagreement with its rationale and holding). The *Shearer* court also noted that "upon the Court's own examination, *Le Cafe Creme* has been cited in 18 subsequent decisions, and . . . that in none of such decisions is the holding in question even remotely referred to or relied upon." 366 B.R. at 503 n. 21.

The Court also disagrees with *Café Creme*, and concludes that regardless of the divisible or non-divisible nature of the contract or whether it was executed outside of the limitations period, each payment made by the debtor under the contract was a separate "transfer" for

55

purposes of the fraudulent transfer statutes. It follows that, even if Gold cannot avoid the contracts that were executed outside of the limitations period, he may still seek to avoid payments made within the applicable limitations period under those contracts.[129]

## 2. Counts IV and V

For reasons similar to those discussed above, the statute of limitations does not bar any of the fraudulent transfer claims under § 548, in Counts IV and V of Gold's Complaint. These Counts seek, in relevant part, avoidance of various alleged fraudulent transfers made "in the one year prior to the Petition Date," *i.e.,* "[b]etween March 29, 2002 and the Petition Date," under 11 U.S.C. §§ 548(a)(1)(A) (Count IV) and 548(a)(1)(B) (Count V)."[130]

The version of 11 U.S.C. § 548 that applies to this adversary proceeding[131] allows Gold to seek to avoid "any transfer . . . that was made . . . on or within one year before the date of the filing of the petition." Because the Complaint expressly limits its claims to transfers made within one year before the date on which Debtors filed their bankruptcy petitions, Gold's claims in Count IV and V are not barred by the statute of limitations. It makes no difference, for statute of limitations purposes, whether such payments were made under contracts executed outside the

---

[129] The non-avoidability of contracts made outside of the statute of limitations period ultimately may be important to the outcome of some of Gold's fraudulent transfer theories. Mich. Comp. Laws Ann. §§ 566.34(b) and 566.35(1), for example, require that, in order to avoid a transfer, Gold must show that the transfer was made "without receiving a reasonably equivalent value." Gold might not be able to satisfy this element for payments made under a non-avoidable contact, because in such a case, the payment resulted in a dollar-for-dollar reduction of the debtor's antecedent debt under the contract. Reduction of antecedent debt is "value" for purposes of these statues. *See* Mich. Comp. Laws. Ann. § 566.33(1) "value is given for a transfer . . . if, in exchange for the transfer . . . *an antecedent debt is . . . satisfied."*(italics added).

[130] Compl. at 75 ¶ 506, 77-78 at ¶¶ 513, 516.

[131] Citations to the Bankruptcy Code in this opinion are to the Code before it was amended by the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005."

56

one-year limitation period.

### E. Count VII – Defendants' arguments that substantive consolidation is barred by the Supreme Court's decisions in *Grupo Mexicano* and *Butner*

Count VII of Plaintiff's Complaint originally sought substantive consolidation of the

Venture Debtors with Larry J. Winget, Sr. ("Winget"); Alicia J. Winget; and the Corporate

Defendants.[132]  Gold's substantive consolidation claim has since been dismissed as to Alicia J.

Winget, by stipulated order.[133]

Substantive consolidation "treats separate legal entities as if they were merged into a

single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities,

which are erased).  The result is that claims of creditors against separate debtors morph to claims

against the consolidated survivor."  *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir.

2005)(citation omitted).  The Sixth Circuit has described substantive consolidation in this way:

> "Substantive consolidation is employed in cases where the
> interrelationships of the debtors are hopelessly obscured and the
> time and expense necessary to attempt to unscramble them is so
> substantial as to threaten the realization of any net assets for all of
> the creditors. In any consolidated case, there is implicit in the
> Court's decision to consolidate the conclusion that the practical
> necessity of consolidation to protect the possible realization of any
> recovery for the majority of the unsecured creditors far outweighs
> the prospective harm to any particular creditor.
>
> Thus, when a case is substantively consolidated, the Order for

---

[132] *See* Compl. at 80 ¶¶ 526-29.  As noted in Part IV-A of this opinion, the "Corporate Defendants" are the following nondebtor entities: Venture Industries Australia, Pty. Ltd.; Venture Nevada, LLC; Pompo Insurance & Indemnity Company, Ltd.; Venture Heavy Machinery, LLC; Golf Course Services, LLC; Venture Real Estate, Inc.; Realven Corporation; Modas, LLC; Linden Creek Enterprises, LLC; Venture Equipment Acquisition Company; Venture Otto South Africa, Pty. Ltd.; Moldite, Inc.; Farm & County Real Estate Company; Winget Construction Services, LLC; VIR Company, LLC; Venture Real Estate Acquisition Company; and Venture Asia Pacific, Pty. Ltd.

[133]  (Docket ## 241 and 258).

consolidation is, in effect, a determination by the Court that consolidation is warranted by the circumstances of the cases and that it is in the best interest of unsecured creditors to join the assets and liabilities of two debtors. It is, in effect, a statement by the Court that the assets and liabilities of one debtor are substantially the same assets and liabilities of the second debtor...."

*First National Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 720 (6th Cir. 1992)(quoting *Evans Temple Church of God in Christ and Cmty. Ctr., Inc. v. Carnegie Body Co. (In re Evans Temple Church of God in Christ and Cmty. Ctr., Inc.),* 55 B.R. 976, 981-82 (N.D. Ohio 1986)).

Defendants Winget, Venture Nevada, Pompo, VIR, and Modas seek dismissal of this Count, arguing that the Court lacks authority to order substantive consolidation. Defendants also argue that even if the Court has authority to order substantive consolidation, it still must dismiss Count VII because "Plaintiff improperly pled the remedy [substantive consolidation] as an affirmative count" and also because Gold "has no standing to raise substantive consolidation on behalf of the Debtors."[134] For the reasons stated below, the Court concludes that (1) it does have authority to order substantive consolidation; (2) the trustee has standing to seek substantive consolidation; and (3) substantive consolidation is properly pled as a separate count in the complaint. The Court will therefore deny the motion to dismiss as to Count VII.

### 1. The impact of *Grupo Mexicano* on the bankruptcy court's authority to order substantive consolidation

Defendants rely on a non-bankruptcy case, *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), to argue that bankruptcy courts lack authority to

---

[134] *See* Br. in Supp. of Defs.' Mot. to Dismiss (Docket # 129) at 22-27; Reply Br. in Supp. of Defs.' Mot. to Dismiss (Docket # 180) at 22-23.

order substantive consolidation.[135]  In *Grupo Mexicano*, the plaintiffs filed a civil action seeking damages for breach of contract.  They requested a preliminary injunction against the defendants, who were a holding company and four of its subsidiaries.  The plaintiffs sought to enjoin the defendants from transferring certain of their assets, pending the final outcome of the case.  The plaintiffs asserted no lien or other equitable interest in the assets.  *Id.* at 310-12.  The district court, after finding that the defendant holding company was either insolvent or at risk of becoming insolvent, entered a preliminary injunction.  The court of appeals affirmed.  *Id.* at 312-13.  The Supreme Court reversed.  *Id.* at 313, 334.  The Supreme Court held that the authority of federal courts to craft equitable remedies is limited to the authority the English Court of Chancery possessed when the Judiciary Act of 1789 was enacted and the Constitution was adopted.  *Id.* at 318.  The Supreme Court held that in 1789, (1) an injunction preventing a defendant from transferring assets in which the plaintiff had no interest, before a judgment was entered against the defendant, did not exist as an equitable remedy, and (2) such a pre-judgment injunction was  "a type of relief that ha[d] never been available before–and especially (as here) a type of relief that has been specifically disclaimed by longstanding judicial precedent."  As a result, the Supreme Court held that the district court did not have the authority to issue a preliminary injunction before the damages claim was adjudicated.  *Id.* at 322, 333.  The Court explained that only Congress has the power to expand the equitable remedies available to federal courts beyond those remedies which were traditionally available to courts of equity.  *Id.* at 333.

Notably, *Grupo Mexicano* distinguished the law applicable to federal courts, in general, from "laws relating to bankruptcy, fraudulent conveyances, and preferences:"

---

[135] *Id.*

Despite Justice GINSBURG's allusion to the "increasing complexities of modern business relations," . . . and to the bygone "age of slow-moving capital and comparatively immobile wealth," . . . we suspect there is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others-or even about their seeking to achieve these ends through "sophisticated . . . strategies,". . . . The law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not.

. . . .

More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws-including those relating to bankruptcy, fraudulent conveyances, and preferences.

*Id.* at 322, 331.

Defendants argue that under *Grupo Mexicano,* federal courts, including bankruptcy courts, do not have authority to impose the equitable remedy of substantive consolidation because (i) there is no federal statute granting federal courts such power; and (ii) such equitable remedy was not administered by the English 'Court of Chancery' in 1789, when Congress enacted the First Judiciary Act.[136]  Defendants further argue that there is no provision of the Bankruptcy Code that authorizes substantive consolidation, at least outside the context of a Chapter 11 plan of reorganization.  They argue that 11 U.S.C. § 105(a) cannot be used as the statutory source for a bankruptcy court's authority to order substantive consolidation.  According to Defendants, a bankruptcy court's equitable powers under § 105(a) are limited to fashioning remedies that further other, specific provisions of the Bankruptcy Code, and there are no such

---

[136] Defs.' Reply in Supp. of Defs.' Mot. to Dismiss (Docket # 180) at 23.

other, specific provisions of the Bankruptcy Code that authorize substantive consolidation.[137]

Therefore, standing alone, § 105(a) does not exempt a bankruptcy court from the general rule of *Grupo Mexicano*.

The Court must reject Defendants' arguments, based on controlling Sixth Circuit precedent. In *Class Five Nevada Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 657-58 (6th Cir. 2002), the Sixth Circuit held that 11 U.S.C. § 105(a) *is* a statutory grant of authority to bankruptcy courts to fashion equitable remedies that are different in type and scope from those traditionally afforded by courts of equity, so that *Grupo Mexicano* does *not* limit a bankruptcy court's equitable powers.

In *Dow Corning*, one of the principal issues was "whether a bankruptcy court has the authority to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan under Chapter 11 of the Bankruptcy Code." *Id.* at 656. The issue arose because the proposed Chapter 11 plan released certain non-debtors (Dow Corning Corporation's shareholders and insurers) "from further liability on claims arising out of settled personal injury claims" and permanently enjoined any party holding a claim released from bringing an action against Dow's insurers or shareholders. *Id.* at 655. The bankruptcy court confirmed the plan with these provisions in it, but interpreted them as applying only to creditors who consented to the plan. The bankruptcy court's reason for this narrow interpretation of the plan was its conclusion that under *Grupo Mexicano*, applying the release and injunction provisions against non-consenting creditors would exceed the bankruptcy court's general equitable authority. The bankruptcy court reasoned that because "non-consensual, non-debtor releases were . . .

---

[137] *See id.* at 24.

61

unprecedented in traditional equity jurisprudence," the bankruptcy court did not have the authority to apply them to bar non-consenting creditors' claims against non-debtors in the Chapter 11 plan. *Id.* at 657.

The district court affirmed the bankruptcy court's order confirming the Chapter 11 plan, but rejected the bankruptcy court's *Grupo Mexicano* analysis. The Sixth Circuit agreed with the district court and held that *Grupo Mexicano* was not applicable because, in enjoining the claims of non-consenting creditors against a non-debtor, the bankruptcy court would not be acting under its general equitable powers, but rather would be acting under equitable powers granted by statute. *Id.* at 657-58. The court first noted that "[t]he Bankruptcy Code does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan." *Id.* at 656. The court next explained that, despite the lack of an express grant of authority to enjoin non-consenting creditors' claims against nondebtors, the bankruptcy court, in this case, derived its equitable authority from three sources. First, "bankruptcy courts, 'as courts of equity, have broad authority to modify creditor-debtor relationships.'" *Id.* (quoting *United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990)). Second,

> section 105(a) of the Bankruptcy Code grants a bankruptcy court the broad authority to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This section grants the bankruptcy court the power to take appropriate equitable measures needed to implement other sections of the Code.

*Id.* (citation omitted). Third, § 1123(b)(6), provides that "a plan [may] . . . include any . . . appropriate provision not inconsistent with the applicable provisions of this title." *Id.*

62

Of these three sources of a bankruptcy court's equitable powers, the *Dow Corning* court specifically singled out § 105(a) as providing the bankruptcy court with authority to confirm a plan with the release and injunction provisions in it. The Sixth Circuit likened § 105(a) to 26 U.S.C. § 7402(a) (1964), a statute at issue in *United States v. First National City Bank,* 379 U.S. 378 (1965), which provides, in relevant part, that "[t]he district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions writs and orders of injunction . . . and such other orders . . . as may be necessary or appropriate for the enforcement of the internal revenue laws." In *First National*, the Supreme Court held that § 7402(a) gave the district court authority to issue an injunction against a third-party foreign branch of a federally chartered bank, enjoining it from transferring any assets of a defendant taxpayer, which was a foreign corporation, pending service of process on the defendant corporation and the resolution of the United State's tax case against the corporation. 379 U.S. at 379-80 & n.1, 385. The *Dow Corning* court reasoned:

> The statute in *First National* gave courts the power to grant injunctions "necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402(a) (1964). Similarly, the Bankruptcy Code gives bankruptcy courts the power to grant injunctions "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). **We conclude that due to this statutory grant of power, the bankruptcy court is not confined to traditional equity jurisprudence and therefore, the bankruptcy court's *Grupo Mexicano* analysis was misplaced."**

280 F.3d at 657-58 (emphasis added). The *Dow Corning* court noted that in *Grupo Mexicano*, the Supreme Court recognized that its analysis is limited to cases where a court is using its general equitable powers rather than its statutory equitable authority:

In *Grupo Mexicano,* the Supreme Court distinguished its own
holding from that in *United States v. First National City Bank,* 379
U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965). *First National*
approved an injunction preventing a third-party bank from
transferring any of a taxpayer's assets. . . . The *Grupo Mexicano*
Court distinguished that holding on the grounds that the *First
National* case "involved not the Court's general equitable powers
under the Judiciary Act of 1789, but its powers under the statute
authorizing tax injunctions." Thus, because the district court had a
statutory basis for issuing such an injunction, it was not confined to
traditional equity jurisprudence available at the enactment of the
Judiciary Act of 1789.

*Id.* at 657 (internal citation omitted). .

Although the *Dow Corning* court held that § 105(a) gave bankruptcy courts "broad"

statutory equitable powers that exceeded those available under traditional equity jurisprudence, it

also recognized that those equitable powers were not limitless. The court recognized that a

bankruptcy court must not exercise its equitable powers in a way that would be inconsistent with

any provision of the Bankruptcy Code. *Id.* at 658. Because the *Dow Corning* court

"determine[d] that enjoining a non-consenting creditor's claim against a non-debtor [was] not

inconsistent with the [Bankruptcy] Code, and that *Grupo* [*Mexicano*] did not preclude such an

injunction," the court went on to determine under what circumstances such a provision was

appropriate to include in a plan under § 1123(b)(6). *Id.*

The holding of *Dow Corning* that § 105(a) is a statutory grant of equitable power to

bankruptcy courts, which makes *Grupo Mexicano* inapplicable, means that *Grupo Mexicano* does

*not* bar bankruptcy courts from ordering substantive consolidation in appropriate cases.

Substantive consolidation is an equitable remedy that is based on Bankruptcy Code § 105(a), and

is not explicitly prohibited by or inconsistent with any provision of the Bankruptcy Code.

64

Defendants take a different view of *Dow Corning*. They argue that *Dow Corning* did not rely on 11 U.S.C. § 105(a), standing alone, as a statutory grant of equitable power that frees bankruptcy courts from the general rule of *Grupo Mexicano*. Rather, according to Defendants, the *Dow Corning* court used § 105(a) plus another provision of the Bankruptcy Code — 11 U.S.C. § 1123(b)(6) — which provides, in relevant part, that "a plan may . . . include any other appropriate provision not inconsistent with the applicable provisions of this title." Defendants argue that under *Dow Corning*, § 105(a) is not a general grant of equitable authority to the bankruptcy courts, but rather is a limited grant of equitable power, which can only be used in conjunction with and in furtherance of powers granted under *other* provisions of the Bankruptcy Code. In this case, substantive consolidation is not being proposed as a part of a Chapter 11 plan, so § 1123(b)(6) does not apply as it did in *Dow Corning*. In this case, § 105(a) is not being used is furtherance of any other specific provision of the Bankruptcy Code. Therefore, according to Defendants, there is no statutory basis to order substantive consolidation, and *Grupo Mexicano's* general rule applies to preclude substantive consolidation.[138]

The Court disagrees with Defendants' interpretation of *Dow Corning*. As discussed above, *Dow Corning* held broadly that § 105(a) places bankruptcy courts into the statutory exception to *Grupo Mexicano's* general rule. That holding is binding on this court, and it means that after *Grupo Mexicano*, bankruptcy courts still have the authority to order substantive consolidation in appropriate cases.

Both before and after the 1978 Bankruptcy Code and its section 105(a) were enacted, substantive consolidation was permitted in bankruptcy cases. Many cases trace the doctrine's

---

[138] *See* Reply Br. in Supp. of Defs.' Mot. to Dismiss (Docket # 180) at 26-27.

origins back at least as far as the 1941 United States Supreme Court decision of *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941).[139]  *See, e.g., In re Owens Corning*, 419 F.3d 195, 209 n.14 (3d Cir. 2005) ("Consolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the Supreme Court's *Sampsell* decision in 1941[.] "); *In re American HomePatient, Inc.,* 298 B.R. 152, 165 (Bankr. M.D. Tenn. 2003)("The remedy of substantive consolidation was recognized by the Supreme Court as early as 1941. *See Sampsell v. Imperial Paper & Color Corp. . . .* Moreover, its roots extend to at least as far back as the Bankruptcy Act of 1898[.]"); *In re Stone & Webster Inc.*, 286 B.R. 532, 538 (Bankr. D. Del. 2002)("The remedy of substantive consolidation was recognized by the Supreme Court as early as 1941."); Seth D. Amera & Alan Kolod, *Substantive Consolidation: Getting Back to Basics*, 14 Am. Bankr. Inst. L. Rev. 1, 1, 3 (2006)("[t]he remedy of substantive consolidation has been a part of bankruptcy jurisprudence since at least the early 1900s," and that "[a]ny discussion of substantive consolidation must begin with *Sampsell v. Imperial Paper & Color Corp.* [because] *Sampsell* is the only case in which the Supreme Court has considered the doctrine of substantive consolidation")(footnote omitted); Samuel R. Maizel and Arnold M. Quittner, *Substantive Consolidation of Debtors and Non-Debtors in Bankruptcy Proceedings*, 2002 Ann. Surv. of Bankr. Law 87 ("The United States Supreme Court has long approved the right of bankruptcy

---

[139]  In *Sampsell*, the United States Supreme Court upheld an order of the bankruptcy court referee "consolidating the estates" of the debtor, who was an individual and the dominant shareholder of a nondebtor corporation, and the nondebtor corporation, thereby "absorb[ing] the corporate assets into the bankruptcy estate of the stockholder," and allowing the bankruptcy trustee to administer the combined assets "for the benefit of the creditors of the estate." 313 U.S. at 217-21.  In so doing, the Supreme Court stated that "[t]he power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete."  *Id.* at 219 (citations omitted).  "Reference to the cases cited in the *Sampsell* opinion shows that *Sampsell* was a fair summary of prior case law." Seth D. Amera & Alan Kolod, *Substantive Consolidation: Getting Back to Basics*, 14 Am. Bankr. Inst. L. Rev. 1, 6 (2006)(citing cases).

courts to order the substantive consolidation of a non-debtor's estate with a debtor's estate. All of the circuit courts of appeal . . . have allowed, in the right circumstances, substantive consolidation of a non-debtor with a debtor's estate.).

Today, § 105(a) provides a statutory basis for substantive consolidation. *See, e.g, Official Committee of Asbestos Claimants v. G-I Holding, Inc.* (*In re G-I Holdings, Inc.*), No. 01-30135, 01-3065, 2001 WL 1598178, at *6 (Bankr. D.N.J. April 6, 2001)("This Court has the power to substantively consolidate corporate entities pursuant to the equitable powers granted to the Bankruptcy Court in 11 U.S.C. § 105(a). It is accepted that bankruptcy courts may consolidate non-debtor entities with a Debtor under the appropriate circumstances.")(citations omitted)(relying in part on *Sampsell*).

The few cases that have directly addressed the issue have all held that bankruptcy courts continue to have authority to order substantive consolidation after *Grupo Mexicano. See, e.g., Wells Fargo Bank of Texas v. Sommers* (*In re Amco Insurance*), 444 F.3d 690, 694, 696 (5th Cir. 2006)(noting that "[t]he district court . . . determined that substantive consolidation remains an available remedy despite the *Grupo Mexicano* holding, reading *Grupo Mexicano* narrowly and noting that *Grupo Mexicano* did not discuss the remedy of substantive consolidation," but finding it unnecessary itself to decide the issue); *In re American HomePatient, Inc.,* 298 B.R. 152, 165 (Bankr. M.D. Tenn. 2003)("Nothing about *Grupo Mexicano* bars this court from authorizing substantive consolidation where appropriate."); *In re Stone & Webster, Inc.*, 286 B.R. 532, (Bankr. D. Del. 2002)(stating that the *Grupo Mexicano* decision "ha[d] nothing to do with substantive consolidation or the authority of a bankruptcy court to grant the remedy of substantive consolidation" and that substantive consolidation's "roots extend to at least as far

67

back as the Bankruptcy Act of 1898, and nothing in the Bankruptcy Code or case law suggests that the remedy is not available today").

Defendants have not cited any case,[140] and the Court is not aware of any case, that holds otherwise. *See also* Seth D. Amera & Alan Kolod, *Substantive Consolidation: Getting Back to Basics*, *supra* at 3 ("the only cases to directly address the issue have found that substantive consolidation survived the *Grupo* [*Mexicano*] decision")(citing cases).

The fact that *Grupo Mexicano* itself distinguished the equitable authority of bankruptcy courts from the general equitable powers of federal courts has led courts to conclude that in *Grupo Mexicano,* the Supreme Court recognized that bankruptcy courts have equitable powers beyond those traditionally available to courts of equity. For example, in *In re Owens Corning,* the court stated:

> [T]he core of *Grupo Mexicano* was the extent of general, unarticulated equity authority in the federal courts (which, the Court held, can only be justified by reference to 1789 equity authority). It was *not* a bankruptcy case. The extensive history of bankruptcy law and judicial precedent renders the issue of equity authority in the bankruptcy context different to such a degree as to make it different in kind. Notably, in the only two instances in which the word "bankruptcy" appears in Justice Scalia's majority opinion in *Grupo Mexicano,* he uses the *existence* of court authority in the bankruptcy context as a reason to support the conclusion that the district court did not have the authority under generalized equity powers to implement the remedy it imposed. . . .
>
> In short, the Court's opinion in *Grupo Mexicano* acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. One way to

---

[140] Defendants admit "that no court yet has relied upon *Grupo* [*Mexicano*] to hold that the equitable remedy of substantive consolidation is beyond the authority of the bankruptcy court." (Br. in Supp. of Defs.' Mot. to Dismiss (Docket # 129) at 23 n.22.)

> conceptualize this idea is to recognize that, had the company in
> *Grupo Mexicano* been in bankruptcy, the bankruptcy court would
> have had the authority to implement the remedy the district court
> lacked authority to order under general equity power outside the
> bankruptcy context.

*In re Owens Corning,* 419 F.3d 195, 209 n.14; *see also In re Stone & Webster*, *Inc.*, 286 B.R.

532, 538 (Bankr. D. Del. 2002)("[I]n *Grupo Mexicano*, the majority opinion strongly suggests

that bankruptcy law provides a court with authority to grant remedies not administered by courts

of equity at the time of the enactment of the Judiciary Act.").

### 2. Defendants' argument based on *Butner v. United States*

In a supplemental memorandum filed after oral argument, Defendants raised some

additional arguments against substantive consolidation. First, Defendants construct an argument

based on *Butner v. United States*, 440 U.S. 48 (1979).

The specific issue in *Butner* was whether the claimed right of a mortgagee "to the rents

collected during the period between the mortgagor's bankruptcy and the foreclosure sale of the

property . . . is determined by a federal rule of equity or by the law of the State where the

property is located." The mortgagee in Butner had a lien on certain real property of the debtor,

but did not have an express security interest in the rents earned by the property. 440 U.S. at 49-

50. The Supreme Court held that absent an identifiable countervailing federal interest, property

interests to be included in a bankruptcy estate should be determined by reference to state law. *Id.*

at 55.

Defendants argue that the 1979 *Butner* case "effectively overruled *Sampsell* [*v. Imperial*

*Paper & Color Corp.*, 313 U.S. 215 (1941)] to the extent *Sampsell* provided any support for use

of the substantive consolidation doctrine," and "also effectively overruled all circuit court and

lower court decisions applying that doctrine."[141]  Defendants argue that "[t]he central holding of

*Butner* is that the rights of a debtor's bankruptcy estate are determined by the federal bankruptcy

statutes and state law."[142]  Defendants reason that "[b]ecause the substantive consolidation

doctrine does not exist under either the federal Bankruptcy Code or state law (specifically, here,

Michigan law) it cannot be applied in this Adversary Proceeding."[143]

     The Court must reject Defendants' argument.  *Butner* did not explicitly or implicitly

overrule *Sampsell*.  Substantive consolidation was not at issue in *Butner*, and *Butner* did not

discuss or mention *Sampsell* or any of the cases that have relied on *Sampsell* as a basis for

ordering substantive consolidation.

     Defendants rely on the following language in *Butner* for their conclusion that *Butner*

overruled *Sampsell*:

> Property interests are created and defined by state law. Unless
> some federal interest requires a different result, there is no reason
> why such interests should be analyzed differently simply because
> an interested party is involved in a bankruptcy proceeding.
> Uniform treatment of property interests by both state and federal
> courts within a State serves to reduce uncertainty, to discourage
> forum shopping, and to prevent a party from receiving "a windfall
> merely by reason of the happenstance of bankruptcy."

440 U.S. at 55 (citation omitted).[144]  Defendants state that "[t]he *Butner* holding is echoed in

Sixth Circuit precedent" (citing *Spartan Tube and Steel, Inc. v. Himmelspach* (*In re RCS*

---

[141]  Suppl. Mem. in Supp. of Defs' Motions to Dismiss (Docket # 323) at 3.

[142]  *Id.* at 2.

[143]  *Id.*

[144]  "Supplemental Memorandum in Support of Defendants' Motions to Dismiss" (Docket # 323,
"Def's Suppl. Memo) at 2-3.

*Engineered Prods. Co.*), 102 F.3d 223, 225 (6th Cir. 1996)( "Whether a particular cause of action is available to the debtor, and thus constitutes "property of the estate," is determined by state law.")(citing *Butner*)).[145]  According to Defendants, "the holding and logic [of *Butner* ] apply directly to the doctrine of substantive consolidation, which does not exist in the Bankruptcy Code or in Michigan law.. . . [but] is instead wholly a creature of federal equity jurisprudence."[146] Therefore, Defendants reason, to the extent that *Sampsell* supported the power to order substantive consolidation based on federal equitable principles, rather than on state law, then after *Butner*, *Sampsell* is no longer good law.

Gold disputes this, arguing that under *Butner*, there is a "federal interest" exception to applying state law to determine property interests.  As quoted above, *Butner* requires a bankruptcy court to look to state law to determine property interests "[u]less some federal interest requires a different result."   Gold argues that "[t]his federal interest was recognized by the Supreme Court in *Sampsell*[.]"[147]

The Court agrees with Gold.  Under the Bankruptcy Code, there is an overriding federal interest in the equitable and efficient distribution of a debtor's property among its creditors.  In *McCafferty v. McCafferty* (*In re McCafferty*), 96 F.3d 192, 196 (6th Cir. 1996), for example, the Sixth Circuit noted that one of the primary goals and central policies of the Bankruptcy Code is "equitable distribution" or "[e]quality of distribution among creditors," and held that when "a

---

[145] *Id.* at 3.

[146] *Id.*

[147] "Trustee's Response to Supplemental Memorandum in Support of Defendants' Motions to Dismiss" (Docket # 325) at 2.

71

claim based on state property law [cannot] be reconciled with a major goal of federal bankruptcy law– ratable distribution among creditors . . . bankruptcy policy prevails" in the case of such a conflict)(citing, in part, the language in *Butner* relied on by Defendants)(citation omitted). *See also Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 251 (3d Cir. 2001)(citations omitted)("It is well-settled" that one of the two overarching purposes which "undergird the Bankruptcy Code in general and the definition of property contained in § 541 in particular," is "the efficient and equitable distribution of an insolvent debtor's remaining assets to its creditors.").

In *Sampsell,* the Supreme Court recognized this federal interest in stating that "[t]he power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete. . . . [T]he theme of the Bankruptcy Act is equality of distribution." 313 U.S. at 219 (citations omitted). In consolidating the estate of a bankruptcy debtor with the estate of a nondebtor, the Supreme Court in *Sampsell* recognized that substantive consolidation is necessary in certain rare situations, where defined and strict equitable criteria are met, to achieve the overriding federal interest of efficient and equitable distribution among a debtor's creditors. *See, e.g., In re Permian Producers Drilling, Inc.,* 263 B.R. 510, 516 (W.D. Tex. 2000)("[T]he Supreme Court recognized that the consolidation of different but related estates is a vital tool in fulfilling a fundamental purpose of bankruptcy proceedings.")(citing *Sampsell*); *In re Baker & Getty Fin. Servs., Inc.*, 78 B.R. 139, 141 (N.D. Ohio 1987)("Substantive consolidation is the merger of separate entities into one action so that the assets and liabilities of both parties may be aggregated in order to effect a more equitable distribution of property among creditors.")

72

Some thirteen years after *Butner*, the Sixth Circuit explained why substantive

consolidation is a remedy that sometimes must be employed by a bankruptcy court to further the

federal interest of providing a fair distribution to a debtor's creditors:

> "Substantive consolidation is employed in cases where the
> interrelationships of the debtors are hopelessly obscured and the
> time and expense necessary to attempt to unscramble them is so
> substantial as to threaten the realization of any net assets for all of
> the creditors. In any consolidated case, there is implicit in the
> Court's decision to consolidate the conclusion that the practical
> necessity of consolidation to protect the possible realization of any
> recovery for the majority of the unsecured creditors far outweighs
> the prospective harm to any particular creditor.
>
> Thus, when a case is substantively consolidated, the Order for
> consolidation is, in effect, a determination by the Court that
> consolidation is warranted by the circumstances of the cases and
> that it is in the best interest of unsecured creditors to join the assets
> and liabilities of two debtors.  It is, in effect, a statement by the
> Court that the assets and liabilities of one debtor are substantially
> the same assets and liabilities of the second debtor...."

*First National Bank of Barnesville v. Rafoth* (*In re Baker & Getty Fin. Servs., Inc.*), 974 F.2d

712, 720 (6th Cir. 1992)(quoting *Evans Temple Church of God in Christ and Cmty. Ctr., Inc. v.*

*Carnegie Body Co.* (*In re Evans Temple Church of God in Christ and Cmty. Ctr., Inc.,*) 55 B.R.

976, 981-81 (N.D. Ohio 1986)).

Defendants have not cited any case, and the Court is not aware of any case, holding that

*Butner* implicitly overruled *Sampsell,* or that *Butner* eliminated the bankruptcy court's power to

order substantive consolidation.  And after *Butner*, the courts have continued to view substantive

consolidation as a remedy that a bankruptcy court can use to bring property into a debtor's

bankruptcy estate, which exists in addition to the power to use similar state law doctrines to

determine what property is part of a debtor's bankruptcy estate.  For example, in *Simpson v.*

73

*Levitsky* (*In re Levitsky*), Bankr. No. 04-16203-JS, Adv. Pro. No. 04-2023, 2008 WL 4516375,

*10 (Bankr. D. Md. September 30, 2008), the Chapter 7 trustee sought "to bring into the

bankruptcy estate the debtor's residence which [was] titled in the name of the non-filing

corporation (and which [was] the sole asset of the debtor's solely-owned corporation)." The

court first looked to Maryland law on veil-piercing, explaining that under *Butner*, "a debtor's

interest in property is determined by state law." *Id.* The court then noted that although the

trustee had not moved for substantive consolidation of the debtor with the non-debtor

corporation, substantive consolidation would provide "alternative grounds . . . to authorize the

Chapter 7 Trustee to take possession of the Property." *Id.* at * 14 (citing *In re Bonham*, 226 B.R.

56 (Bankr. D. Ala. 1998)).

Likewise, in *Searcy v. Knight* (*In re American Int'l Refinery*), Bankruptcy Nos. 04-21331,

04-21332, Adv. Pro. No. 06-2018, 2008 WL 2116411, * 8-9 (Bankr. W.D. La. May 19,

2008)(footnote omitted), the court discussed substantive consolidation and state alter ego

doctrine as alternative grounds for disregarding corporate forms:

> Non-bankruptcy law governs whether a debtor has an interest in
> property. Accordingly, the first step in determining whether the
> debtor has an interest in property is to look to state law, or federal
> substantive law if the underlying interest is grounded upon federal
> law. *Butner v. United States,* 440 U.S. 48, 54 (1977); *In re
> Supreme Beef Processors, Inc.,* 468 F.3d 248, 255 (5th Cir.2006).
> Once property rights are determined under non-bankruptcy law,
> federal bankruptcy law establishes the extent to which the property
> interest is property of the bankruptcy estate under section 541 of
> the Bankruptcy Code. *Butner,* 440 U.S. at 54.
>
> * * *
> Federal bankruptcy law and state corporate law provide grounds
> for disregarding the separate corporate existence of a parent and its
> subsidiary under certain circumstances. For example, substantive

> consolidation is a federal bankruptcy remedy through which the
> assets and liabilities of different legal entities may be consolidated
> and treated as the assets and liabilities of a single estate for
> purposes of the bankruptcy case. *See, e.g., In re ArkLa-Tex Timber
> Co., Inc.,* 482 F.3d 319, 327 (5th Cir.2007); *In re Owens Corning,*
> 419 F.3d 195, 205 (3rd Cir.2005) ("Substantive consolidation, a
> construct of federal common law, emanates from equity.")

In general, lower courts should be reluctant to find that the Supreme Court has *implicitly*

overruled longstanding precedent. *See Levine v. Heffernan*, 864 F.2d 457, 461 (7th Cir. 1988).

In light of this general rule; the lack of any case law supporting Defendants' position; the

precedent both before and after *Butner* holding that a bankruptcy court has authority to order

substantive consolidation; and for the other reasons discussed above, the Court concludes that

*Butner* did not implicitly overrule *Sampsell,* and does not preclude substantive consolidation.

### 3. Defendants' law review-based arguments for dismissal of the substantive consolidation Count

In their supplemental memorandum, Defendants also incorporated by reference, without

further explanation, the following "additional arguments" against substantive consolidation,

found in the article, Kurt A. Mayr, *Back to Butner's Basic Rule - the Fundamental Flaw of

Nondebtor Substantive Consolidation,* 16 Norton J. Bankr. L. & Prac. 1 Art. 4 (Feb. 2007):

> that application of substantive consolidation to non-debtors (i)
> eviscerates the statutory protections contained in section 303 of the
> Code, (ii) causes notice problems with respect to stakeholders in
> the non-debtor entities that necessarily result in lack of
> constitutional due process, and (iii) causes numerous other
> interpretation problems, e.g., when and to whom does the
> automatic stay apply.[148]

The Court must reject these arguments at this stage of the case. Defendants' manner of

---

[148] Def's Suppl. Memo at 3-4 (Docket # 323).

75

making these arguments is deficient. *Cf. Birch v. Choinski* (*In re Choinski*), 214 B.R. 515, 524 n.13 (B.A.P. 1st Cir. 1997)("On appeal, 'issues adverted to in a perfunctory manner,' such as here, 'unaccompanied by some effort at developed argumentation, are deemed waived.'")(citations omitted); *United States v. Broadnax*, 475 F. Supp. 2d 783, (N.D. Ind. 2007)(explaining that "[t]he Seventh Circuit has held, '[p]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues'" and stating: "This Court does not bear the obligation of researching and constructing the legal arguments open to the parties, especially when they are represented by counsel. . . . This Court will not shy from summarily dismissing allegations of error where a party has presented undeveloped arguments unsupported by pertinent authority.")(citations omitted).

As a result, the Court declines to discuss Defendants' arguments here in depth, but will respond briefly to them, as follows:

(i) Substantive consolidation does not eviscerate the protections of nondebtors contained in § 303 of the Bankruptcy Code, because by definition, those protections only apply when creditors use § 303 to file and prosecute an involuntary bankruptcy petition. Substantive consolidation is a different remedy with a different purpose. The doctrine of substantive consolidation has its own protections for the nondebtor built into it. *See* Kit Weitnauer, *Substantive Consolidation of Non-Debtors; Another Perspective*, 23-May Am. Bankr. Inst. J. 1, 46 (May 2004)("A majority of courts permit the doctrine of substantive consolidation to be applied to a non-debtor. Concerns that the substantive consolidation of a non-debtor is inconsistent with §303 of the Code . . . have been answered by the *Munford* decision [(*Munford*

76

*Inc. v. TOC Retail Inc.* (*In re Munford Inc.*)*,* 115 B.R. 390 (Bankr. N.D. Ga. 1990))], and others, which point out the distinction between those two remedies."); *see also* Kurt A. Mayr, *Back to Butner's Basic Rule, supra* at n.46 and accompanying text (citing cases that have held that substantive consolidation does not conflict with § 303).

(ii)    Substantive consolidation need not cause notice problems for the stakeholders of a non-debtor that deprives them of due process.  A bankruptcy court can assure that notice and an opportunity to be heard on the issue of substantive consolidation is provided to the stakeholders of any targeted nondebtor.  In this case, the Court expects soon to discuss with the parties the entry of an order (1) requiring that notice be provided to all creditors and equity holders of the targeted nondebtors, and (2) that sets up a procedure to permit these creditors and equity holders to be heard on the substantive consolidation issue.

(iii)    To the extent substantive consolidation results in other "interpretation problems," the simple answer is that the bankruptcy courts can resolve them, subject as always to appellate review.

**4.    Defendants' other arguments for dismissal of the substantive consolidation Count**

**(a)    Defendant's argument that substantive consolidation is not an independent cause of action that can be brought as a separate count in a complaint**

Defendants argue that "[e]ven if this Court finds that it has the constitutional and statutory authority to grant the plaintiffs' request for substantive consolidation, plaintiffs' claim must fail as it has been pled incorrectly as a cause of action."[149]  According to Defendants,

---

[149] Br. in Supp. of Defs.' Mot. to Dismiss (Docket # 129) at 27.

"[s]ubstantive consolidation is an equitable remedy, . . . not a separate cause of action for which relief can be granted."[150]

Defendants have not cited any case to support this argument. In essence, Defendants argue that the doctrine of substantive consolidation has no separate existence, distinct from other theories for relief. The Court must reject this argument, for the reasons discussed above. And cases have allowed complaints to proceed that seek only substantive consolidation. *See, e.g., Munford, Inc. v. TOC Retail, Inc.* (*In re Munford, Inc.*), 115 B.R. 390, 390-91, 398 (Bankr. N.D. Ga. 1990)(denying the defendants' motion to dismiss the plaintiff's complaint which sought only "a judgment substantively consolidating" the assets of two non-debtor corporations with the assets of the debtor corporation); *Kroh Brothers Dev. Co. v. Kroh Brothers Mgmt Co.* (*In re Kroh Brothers Dev. Co.*), 117 B.R. 499 (W.D. Mo. 1989)(debtor corporation filed a complaint seeking only substantive consolidation of its assets with those of a related non-debtor corporation; the bankruptcy court ordered substantive consolidation, and the district court affirmed that decision).

**(b)      Defendants' argument that the Chapter 7 trustee has no standing to pursue substantive consolidation, as the successor of the Debtors**

Second, Defendants argue that Gold has no standing to seek substantive substantive consolidation. This is so, Defendants argue, because Gold, as the Debtors' successor-in interest, stands "in the shoes of the Debtors,"[151] and the Debtors lack standing under Michigan law to

---

[150] *Id.*

[151] Br. in Supp. of Defs.' Mot. to Dismiss (Docket # 129) at 28-29.

pursue an alter ego claim against their parent entities or shareholders.[152]

This argument fails, because as discussed above, substantive consolidation is an equitable remedy based on federal law. Although similar in some ways to alter-ego or veil-piercing doctrines, substantive consolidation is separate and distinct from these state law doctrines. A Chapter 7 trustee does have standing to seek substantive consolidation on behalf of the bankruptcy estate. *See, e.g., In re Bonham*, 226 B.R. 56, 92 (Bankr. D. Ala. 1998)(criticizing another court's alluding "to the fact that the trustee perhaps did not have standing to pursue the alter ego claim," in determining whether to grant substantive consolidation of a corporate debtor's assets with those of an individual nondebtor, and stating that "[p]iercing the corporate veil . . . is not a prerequisite to the utilization of the bankruptcy law remedy of substantive consolidation"); *Helena Chemical Co. v. Circle Land and Cattle Corp.* (*In re Circle Land and Cattle Corp.*), 213 B.R. 870, 876 (Bankr. D. Kan. 1997)(distinguishing alter-ego and veil-piercing from substantive consolidation); *Munford Inc. v. TOC Retail Inc.* (*In re Munford Inc.*), 115 B.R. 390, 394 (Bankr. N.D. Ga. 1990)(same); *Kroh Brothers Dev. Co. v. Kroh Brothers Mgmt Co.* (*In re Kroh Brothers Development Co.*), 117 B.R. 499, 501-02 (W.D. Mo. 1989)(same).

For all of the reasons discussed above, Defendants' motion to dismiss Count VII must be denied.

**F. Defendants' judicial estoppel argument and related arguments**

**1. Judicial Estoppel**

Several of the Defendants in Case No. 04-4373 (Winget, Venture Nevada, Pompo, VIR,

---

[152] *Id.* at 29.

and Modas) and in two of the cases consolidated with No. 04-4373 seek dismissal of all claims

against them that are premised on actual (intentional) fraud, as opposed to constructive fraud,

based on judicial estoppel. According to the Defendants, several counts in each case are

"grounded at least in part on actual fraud," and are barred by judicial estoppel. The Defendants

making this argument, and the cases and counts affected by it, are as follows:[153]

| Adv. Pro. #: | Defendants: | Counts affected: |
|---|---|---|
| 04-4373 | Winget, Venture Nevada, Pompo, VIR, Modas | III, IV |
| 03-5356 | Venture Sales & Engineering | I, II |
| 05-4963 | Venco Management Canada, Ltd. | I |
| 05-4972 | Winget | I |
|  |  |  |

In addition, other defendants in several of the consolidated cases "concur" with the above

Defendants' arguments, and seek dismissal of fraud counts against them for the same reasons.

These are:[154]

---

[153] Suppl. Br., etc. (Docket # 215) at 4, 6 n.5.

[154] Corrected Concurrence in Suppl. Br., etc. (Docket # 218) at 2-3.

| Adv. Pro. #: | Defendants: | Counts affected: |
|---|---|---|
| 04-4373 | Venture Industry Australia, PTY, LTD<br>Golf Course Services, LLC<br>Linden Creek Enterprises, LLC<br>Winget Construction Services, LLC<br>Venture Asia Pacific, PTY, LTD<br>Lot Finishers, Inc.<br>Shefco, Inc.<br>Alicia J. Winget<br>Brian P. Winget<br>Adelicia J. Tiganelli<br>Gwendolyn Cameron<br>N. Matthew Winget | III, IV |
| 05-4964 | Millard Design Australia, PTY, LTD | I, II |
| 05-4968 | Linden Creek Real Estate, LLC | I, II |
| 05-4969 | M & M Flow Through Systems, LLC | I, II |

Defendants argue that Gold is precluded from making any claim in these cases that Larry Winget committed any "actual fraud," *i.e.*, fraud of the intentional variety as opposed to mere constructive fraud, which does not require any intent to hinder, delay, or defraud anyone. All such "actual fraud" claims are precluded by the doctrine of judicial estoppel, Defendants argue, because of an allegation that Gold made in a complaint and an amended complaint in another case in this court, *Gold v. Deloitte & Touche* (*In re NM Holdings Co., LLC*), Adversary Proceeding No. 06-4615.[155]

Some background about the *Deloitte & Touche* case is necessary to understand Defendants' judicial estoppel argument. In the *Deloitte & Touche* case, Gold sued the Debtors'

---

[155] The parties agree that this Court can and should consider documents filed in the *Deloitte & Touche* case, because those are a matter of public record. *See generally Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (in considering a Rule 12(b)(6) motion, the Court may consider, among other things, "matters of public record").

independent auditor for damages relating to Deloitte's pre-petition work for the Debtors, under several theories, including malpractice and aiding-and-abetting breach of fiduciary duty. Gold sought to hold Deloitte liable for over $300 million in damages, alleging that Deloitte's negligence allowed Larry Winget to accomplish the many related-party transactions that are the subject of Gold's claims in the present cases, and that Deloitte aided and abetted Winget's conduct.

Gold made the following allegation in his initial complaint and first amended complaint filed in the *Deloitte & Touche* case: "While Winget's actions were wrongful as to Venture and its creditors, those actions were neither prohibited nor almost entirely prohibited under a penal or criminal statute."[156]

The parties agree that Gold made this allegation in the *Deloitte & Touche* case to try to avoid the defense known as the "wrongful conduct rule" under Michigan law. This Court summarized that defense in its October 16, 2008 opinion in the *Deloitte & Touche* case:

> At this point, the Court must pause to discuss an argument concerning Michigan's "wrongful conduct rule." At least with respect to imputing the wrongful *conduct* of a corporate agent to the corporation, and the effect of imputing such conduct to the corporation, Michigan law recognizes a form of the "wrongful conduct rule." The Michigan Supreme Court has described Michigan's wrongful-conduct rule in this way:
>
> > When a plaintiff's action is based, in whole or in part, on his own illegal conduct, a fundamental common-law maxim generally applies to bar the plaintiff's claim:
> >
> > > [A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or

---

[156] Plaintiff's First Amended Complaint (Docket # 79 in Adv. Pro. No. 06-4615) at 5 ¶ 19; Plaintiff's Complaint and Jury Demand (Docket # 1 in Adv. Pro. No. 06-4615) at 5 ¶ 18.

transaction to which he is a party.

When a plaintiff's action is based on his own illegal conduct, and the defendant has participated equally in the illegal activity, a similar common-law maxim, known as the "doctrine of in pari delicto" generally applies to also bar the plaintiff's claim:

> [A]s between parties in pari delicto, that is equally in the wrong, the law will not lend itself to afford relief to one as against the other, but will leave them as it finds them.

*Orzel v. Scott Drug Co.*, 537 N.W. 2d 208, 212-13 (Mich. 1995)(citations omitted). **"To implicate the wrongful-conduct rule, the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute."** *Id.* at 214.

*Gold v. Deloitte & Touche, LLP (In re NM Holdings Co., LLC)*, Adv. No. 06-4615, 2008 WL 4602263, at *21-22 (Bankr. E.D. Mich. October 16, 2008)(italics in original; bold emphasis added).[157]

Defendants argue that Gold's allegation in the *Deloitte & Touche* case, that Winget's actions "were neither prohibited nor almost entirely prohibited under a penal or criminal statute," is inconsistent with any allegation in the present cases that Winget committed any "actual fraud." As a result, Defendants argue, Gold is barred by judicial estoppel from now asserting any claims of actual fraud against Winget, and against the other Defendants premised upon Winget's actual fraud.

The Sixth Circuit has described the doctrine of judicial estoppel in this way:

> "Judicial estoppel forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by that same party in an earlier proceeding." *Warda v. C.I.R.*, 15 F.3d 533, 538 (6th Cir.1994). "Federal standards govern the application

---

[157] Docket # 120 in the *Deloitte & Touche* case, at 45.

of judicial estoppel in federal court.'' *Id.* at n. 4 (citing *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598 n. 4 (6th Cir.1982)).

The Supreme Court has developed three factors we are to consider when determining whether to apply the doctrine of judicial estoppel. *See New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). ''First, a party's later position must be 'clearly inconsistent' with its earlier position.'' *Id.* (quoting *United States v. Hook,* 195 F.3d 299, 306 (7th Cir.1999)). Second, we may consider whether the party had successfully persuaded a court to accept his previous position, ''so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that the first or the second court was misled.''' *Id.* (quoting *Edwards,* 690 F.2d at 599). Finally, we may consider ''whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'' *Id.* at 751, 121 S.Ct. 1808. **We have placed particular emphasis on the second factor, stating that ''judicial estoppel governs a dispute only if the first court 'adopted the position urged by the party, either as a preliminary matter or as part of a final disposition.' ''** *Warda,* 15 F.3d at 538 (quoting *Teledyne Indus. v. National Labor Relations Bd.,* 911 F.2d 1214, 1218 (6th Cir.1990)).

*Pennycuff v. Fentress Cty. Bd. of Edu.*, 404 F.3d 447, 452-53 (6th Cir. 2005)(emphasis added);

*see also Lorillard Tobacco Co. v. Chester, Wilcox, & Saxbe, LLP*, 546 F.3d 752, 757-58 (6th Cir. 2008).

Defendants' judicial estoppel argument fails because this Court did not adopt the position urged by Gold in the *Deloitte & Touche* case — *i.e.*, Gold's allegation that Winget's "actions were neither prohibited nor almost entirely prohibited under a penal or criminal statute" — either "as a preliminary matter or as part of a final disposition." Rather, Deloitte prevailed on all of Gold's claims in this Court, subject to pending district court review. This Court granted Deloitte's motion to dismiss all counts in Gold's complaint, including the malpractice and aiding and abetting claims, on various grounds. None of those grounds had anything to do with the

84

issue of whether or not Winget's actions were prohibited or almost entirely prohibited under a penal or criminal state. *See In re NM Holdings Co., LLC*, 2008 WL 4602263, at \*21-22. Rather, this Court found it unnecessary to reach that issue, and expressly declined to do so. *See id*. at \*22 (and finding it unnecessary to determine whether Michigan's wrongful conduct rule applied).[158]

Under *Pennycuff*, and the earlier Sixth Circuit cases cited in *Pennycuff*, therefore, judicial estoppel does not apply. This is so even if this Court could conclude that Gold's allegations in the *Deloitte & Touche* case were "clearly inconsistent" with Gold's assertion of actual fraud claims in these cases, a disputed issue that this Court need not decide. As the Supreme Court pointed out in *State of New Hampshire v. State of Maine*, 532 U.S. 742, 749, 750-51 (2001)(citations omitted), the purpose of judicial estoppel is "to protect the integrity of the judicial process," and "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity."

### 2. Abandonment

Defendants also argue that Gold's allegation in the *Deloitte & Touche* case bars his actual fraud claims based on the concepts of "abandonment" and "judicial admission." But these arguments add nothing meaningful to Defendants' judicial estoppel argument, and also are

---

[158]  For the reasons stated in its October 16, 2008 opinion cited above, this Court entered an order dismissing Gold's fraudulent transfer claim based on the statute of limitations. (Docket # 121 in the *Deloitte & Touche* case). And the Court recommended that the district court dismiss all of Gold's other claims, which this Court found to be non-core claims. (Docket # 122 in the *Deloitte & Touche* case). Gold appealed the dismissal order to the district court, and filed objections to this Court's dismissal recommendation. (Docket ## 126, 138 in the *Deloitte & Touche* case). Both the appeal and the dismissal recommendation are now pending in the district court.

without merit.

Defendants argue that Gold's allegation in the *Deloitte & Touche* case "constitutes an unequivocal abandonment of the position" in these cases that Winget committed any "actual fraud." Defendants cite two cases in support of their abandonment argument: *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 214 (1st Cir. 1987) and *United States v. Levasseur*, 699 F. Supp. 965, 974 (D. Mass. 1988).[159] Neither case recognizes abandonment as anything but a specific form of judicial estoppel. *Patriot Cinemas* simply applied the judicial estoppel doctrine to a party's earlier, explicit statement that it would not pursue a specific antitrust claim in the future. *See* 834 F.2d at 211-12, 214-15. The *Levasseur* case made the following statement about abandonment: "In this Circuit, therefore, abandonment of a claim to obtain a litigation advantage precludes the later reassertion of that claim." 699 F.Supp. at 974. The *Levasseur* court's explicit basis for that conclusion, however, was the doctrine of judicial estoppel, and the language just quoted came immediately after the court quoted the *Patriot Cinemas* case at length, discussing judicial estoppel. As used in the cases cited by Defendants, then, "abandonment" is merely a specific form of judicial estoppel. The abandonment argument, therefore, must fail because at least one of the requirements for judicial estoppel in the Sixth Circuit is not met here, as previously discussed.

### 3. Judicial admission

Defendants also argue that Gold's allegations in the *Deloitte & Touche* case are "judicial admissions" that are conclusively binding on Gold in the present cases. Defendants are incorrect, however, because Gold's purported admissions were made in a different case, not this case.

---

[159] Defs.' Suppl. Brief (Docket # 215) at 12.

Because of this, the purported admissions can be conclusively binding in *this* case only if judicial estoppel applies, which it does not.

Initially, it should be noted that Defendants cite some cases from jurisdictions outside the Sixth Circuit that discuss what amounts to judicial estoppel under the label of judicial admissions. But as one court has noted, "[t]he specific requirements [for application of judicial estoppel], however, are 'rather vague' and vary from state to state and circuit to circuit." *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d at 212. And "[m]any federal courts. . . have long employed the doctrine [of judicial estoppel] in principle whether or not in name." *Id.*

The law makes a distinction between (1) treating an allegation made by a party in a *different* case as conclusively binding on that party, under the doctrine of judicial estoppel, on the one hand; and (2) treating such a statement as a mere evidentiary admission, which is admissible against but not conclusively binding on the party, on the other hand. While an admission made by a party in a pleading in the *same* case sometimes may be deemed binding as a "judicial admission," an admission made in a *different* case is not conclusively binding, unless judicial estoppel applies. One treatise explained the distinction in this way:

> Judicial admissions must be distinguished from ordinary evidentiary admissions. A judicial admission is binding upon the party making it; it may not be controverted at trial or on appeal. Included within this category are admissions in the pleadings in the proceeding, stipulations and admissions pursuant to request to admit. . . . **Ordinary evidentiary admissions, on the other hand, may be controverted or explained by the party. Within this category fall pleadings in another proceeding**, superseded or withdrawn pleadings in the same proceeding, answers to interrogatories, as well as other statements admissible under [Federal Evidence] Rule 801(d)(2).

Hon. Barry Russell, *Bankruptcy Evidence Manual*, 2008-2009 Ed., § 801:22, at 1507-08 (West

2008)(emphasis added)(citations omitted). *See also State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968);[160] *Americans United for Separation of Church and State v. Prison Fellowship Ministries*, 395 F. Supp.2d 805, 808-09 (S.D. Iowa 2005)(same); 2 Kenneth S. Broun, *McCormick on Evidence* § 257 (6th ed. 2006)(same).

The Sixth Circuit appears to follow this distinction between judicial admissions and evidentiary admissions. On the one hand, the Sixth Circuit has held that a party's admission of facts in its answer, filed in the *same* case, was binding on that party, at least in the absence of "exceptional circumstances mandating relief from the admission," and where the party did not attempt to amend its answer until shortly before trial. *See Ferguson v. Neighborhood Housing Services*, 780 F.2d 549, 551 (6th Cir. 1986)(alternate holding). On the other hand, the Sixth Circuit has stated at least twice that "[p]leadings in a prior case may be used as evidentiary admissions." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000); *Williams v. Union Carbide Corp.*, 790 F.2d 552, 556 (6th Cir. 1986). Of these two Sixth Circuit cases, *Barnes* involved statements the plaintiffs made in their complaint in the same lawsuit;

---

[160] In the *State Farm* case, the Eighth Circuit cited Wigmore, and explained:

> [J]udicial admissions are binding for the purpose of the case in which the admissions are made including appeals. This does not make the same judicial admissions conclusive and binding in separate and subsequent cases. The purpose of a judicial admission is that it acts as a substitute for evidence in that it does away with the need for evidence in regard to the subject matter of the judicial admission. IX Wigmore, Evidence § 2588 (3rd ed. 1940). Wigmore notes that 'Judicial admissions are conclusive in their nature but that effect is confined to the cause in which they are made. When used in other cases as ordinary admissions, they are, of course, * * * not conclusive.' IX Wigmore, Evidence § 1066 (3rd ed. 1940).

405 F.2d at 686.

*Williams* involved statements made in the plaintiff's complaint filed in a prior lawsuit. Each case held that the pleadings were admissible in evidence at trial under Fed.R.Evid. 801(d)(2), as an admission by a party-opponent. But neither case held that the pleadings were conclusively binding admissions. In fact, each case noted that while the party making the prior statement might have a "quite persuasive" argument that "the statements were made merely to preserve legal rights," such an argument should be "made to the jury." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d at 829*; Williams v. Union Carbide Corp.*, 790 F.2d at 556.

Thus, the Court concludes it could treat a statement made by Gold in a pleading in a *different* case as conclusively binding in the present cases only if judicial estoppel applies. But as described above, the requirements imposed by the Sixth Circuit for judicial estoppel are not met here.

For the reasons stated, the Court must reject Defendants' judicial estoppel, abandonment, and judicial-admission arguments as a basis for dismissing any of Gold's claims in the present cases.

## G. Count I — Defendants' arguments for dismissing Gold's unjust enrichment claim

In Count I of the Complaint, Gold seeks damages against all of the Defendants based on a theory of unjust enrichment. Count I seeks damages for transfers Debtors made to the Corporate Defendants and the Winget affiliates, "for which no services were rendered by them and/or without the Debtors' receiving reasonably equivalent value in exchange for the transfers."[161] The Complaint states that the amount of damages is "subject to proof at trial," but except for two

---

[161] Compl. at 67-69 ¶¶ 476-483.

Defendants, specifies the minimum amount of damages Gold seeks against each Defendant.[162]

The Defendants argue that Count I must be dismissed because (1) there can be no claim for unjust enrichment where there is an express contract between the parties; and (2) the Complaint admits that there were written contracts between Debtors and several of the Defendants, namely, Venture Australia, Pompo, certain of the Deluxe Debtors, Moldite, VS&E and Harper.[163]

Defendant Venture Nevada, LLC makes a similar argument that Count I must be dismissed as against it. It argues that the only allegation regarding the $26,531,943 transfer amount that Gold seeks to recover from Venture Nevada is that the Debtor VM&E paid this sum to Shelby American under "certain agreements and promissory notes between those two entities." And there is no allegation that any of the $26,531,943 was later transferred to Venture Nevada.[164]

Gold contends that the Court should not dismiss his unjust enrichment claim because "[u]nder Michigan law, a party is permitted to maintain a claim for both breach of contract and unjust enrichment claims as alternative theories."[165]  Gold also argues that his unjust enrichment

---

[162] *Id.* at 68-69.

[163] Br. in Supp. of Defs. Mot. To Dismiss at 30-31.

[164] *Id.*  In their reply brief in support of their motion to dismiss, the Defendants also argued, for the first time, that the Court should dismiss the unjust enrichment claims against Winget because "[Gold] has not clarified [his] basis for suing Winget personally for $314,569,559 million on its unjust enrichment theory." (Reply Br. in Supp. of Defs.' Mot. to Dismiss (Docket # 180) at 29.)  The Court declines to consider this argument as it was not properly raised in Defendants' initial motion to dismiss. *See D'Alessandro v. Bugler Tobacco Co.*, No. 05-5051, 2007 WL 130798 (D.N.J. January 12, 2007)("A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief.  No sur-reply is permitted, so the opponent has no opportunity to address the new defense.")(internal quotation marks and citations omitted).

[165] Objection by Official Committee of Unsecured Creditors to Mot. to Dismiss the Adv. Compl. in Part (Docket # 163) at 31.

90

claims are viable because he has alleged in Count I that any related contracts between the parties are unenforceable and/or void.[166]  The Complaint alleges:  "To the extent that any contracts existed between the parties that relate to the factual allegations that support Plaintiffs' claim for unjust enrichment, such contracts are unconscionable and void, based on the factual allegations set forth herein."[167]

The Court agrees with Gold that under Michigan law, a party may plead an unjust enrichment claim in the alternative to a breach of contract claim.  *Durant v. Service Master Co.*, 159 F. Supp. 2d 977, 983 (E.D. Mich. 2001)(rejecting the Defendants' argument "that the Court should dismiss Plaintiffs' claim for unjust enrichment because Plaintiffs have pled an express contract," and holding that "a plaintiff may assert theories of both breach of contract and unjust enrichment in the same complaint")(applying Michigan law).  This is especially true when there is an issue regarding whether the contract between the parties is valid or enforceable.  *See Terry Barr Sales Agency Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181-82 (6th Cir. 1996)(reinstating claims for promissory estoppel and unjust enrichment in a suit for breach of contract, where there was the possibility that, on remand, one of the parties would deny the existence of a contract between the parties)(applying Michigan law).

The Court need not decide whether an unjust enrichment claim is properly pled against Defendant Venture Nevada, because Gold concedes that he has failed to state a claim for unjust

---

[166] Objection by Official Committee of Unsecured Creditors to Mot. to Dismiss the Adv. Compl. in Part (Docket # 163) at 33 ¶ 93.

[167] Compl. at 68 ¶ 483.

enrichment against Venture Nevada.[168]

For these reasons, the Court will dismiss Count I for unjust enrichment as to Venture Nevada only, without prejudice to Gold's right to file an amended complaint.

### H. Counts VI and XIII — Defendants' arguments for dismissing Gold's claims (1) for recharacterization of debt as equity or, alternatively, to subordinate debt (Count VI), and (2) for disallowance of claims under 11 U.S.C. § 502(d)

Count VI of the Complaint seeks recharacterization of debt as equity or, alternatively, to subordinate debt, and is pled against all of the Defendants.[169]  Count XIII seeks disallowance of claims under 11 U.S.C. § 502(d), and is also pled against all of the Defendants.[170]

### 1. The Defendants who have not filed proofs of claims

Each of the following Defendants argue that the Court should dismiss both of these counts against them because they have not filed a proof of claim against any of the Debtors, and therefore, they have no claimed debt to recharacterize or subordinate, and no claim to disallow:

1. N. Matthew Winget;[171]
2. Alicia J. Winget;
3. Brian P. Winget;
4. Adelicia J. Tignanelli;
5. Gwendolyn Cameron;[172]
6. Venture Nevada, LLC;

---

[168] *See* Obj. by Official Committee, etc. (Docket # 163) at 2-3 n.2, 31 n.15.

[169] Compl. at 79 ¶¶ 518-524.

[170] *Id.* at 90 ¶¶ 563-65.

[171] N. Matthew Winget and Linden Creek Enterprises, LLC's Mot. to Dismiss Compl. in Part (Docket # 105) at 3 ¶ 4.

[172] Br. in Supp. of Alicia J. Winget; Brian P. Winget; Adelicia J. Tignanelli; Gwendolyn Cameron; Golf Course Services, LLC; and Winget Construction, LLC's Mot. to Dismiss Adv. Compl. (Docket # 118) at 18 ¶ G.

7. VIR Company LLC;[173]
8. Venture Industries Australia, Pty. Ltd.; and
9. Venture Asia Pacific, Pty. Ltd.[174]

The Committee and later Gold, who adopted the position of the Committee, did not dispute these Defendants' assertions that they had not filed a proof of claim, and, in fact, agreed to dismiss Count VI (for recharacterization of debt as equity and equitable subordination) against these Defendants "provided that those defendants stipulate that they have not filed and will not file a proof of claim in this bankruptcy proceeding."[175] Gold failed to address the Defendants' request for dismissal of Count XIII for disallowance of claims under 11 U.S.C. § 502(d).

The Court must grant these Defendants' motions to dismiss both Count VI and Count XIII, because it is undisputed that they have not filed any proof of claim in Debtors' bankruptcy cases. As to these Defendants, there is no debt to recharacterize and no claim to subordinate. Therefore, Counts VI fails to state a claim upon which relief can be granted against these Defendants. *See, e.g.*, *Limor v. Buerger* (*In re Del-Met Corp.*), 322 B.R. 781, 806 (Bankr. M.D.

---

[173] Br. in Supp. of Defs. Larry J. Winget, Sr., Venture Nevada LLC, Pompo Insurance & Indemnity Company, Ltd., VIR Company LLC and Modas LLC's Combined Mot. to Dismiss in Part the Adv. Compl. (Docket # 129) at 33 ¶ VI.

[174] Defs. Venture Industries Australia, Pty. Ltd.'s and Venture Asia Pacific, Pty. Ltd.'s Mot. to Dismiss (Docket # 133) at ¶ 5.

[175] Objection by Official Committee of Unsecured Creditors to Mot. to Dismiss the Adv. Compl. in Part (Docket # 163) at 2 n.2 (regarding VIR Company, LLC and Venture Nevada, LLC); *see also* Objection by Official Committee of Unsecured Creditors to Mot. of Defs. N. Matthew Winget and Linden Creek Enterprises to Dismiss the Adv. Compl. in Part (Docket # 170) at 11 ¶ 39 (regarding N. Mathew Winget); Objection by Official Committee of Unsecured Creditors to Mot. of Alicia J. Winget, et. al. to Dismiss the Adv. Compl. in Part (Docket # 171) at 24 ¶ 71 (regarding Alicia J. Winget, Brian P. Winget, Adelicia J. Tiganelli and Gwendolyn Cameron); and Objection by Official Committee of Unsecured Creditors to Mot. of Defs. Venture Industries Australia, Pty. and Venture Asia Pacific Pty. Ltd. to Dismiss the Adv. Compl. in Part (Docket # 165) at 15 ¶ 47 (regarding both of the Defendants).

Tenn. 2005)(dismissing the plaintiff's claim for equitable subordination without prejudice, where the defendants had not yet filed any claim against the bankruptcy estates, but "the deadline for filing proofs of claim ha[d] not yet passed and . . . some of the [d]efendants named in the [equitable subordination count] ha[d] 'reserved their rights to assert claims at a later date'"). Similarly, because Defendants have not filed any proofs of claim, there is no claim to disallow under § 502(d). *See, e.g., Stair v. Shumate* (*In re Shumate*), 42 B.R. 462, 465 (Bankr. E.D. Tenn. 1984)(stating "that § 502 by its terms makes no provision for a debtor to object to a claim unless a proof of claim has been filed"). For these reasons, the Court will dismiss, without prejudice, Counts VI and XIII against the Defendants listed above.

### 2. The Defendants who have filed proofs of claims

Two Defendants who seek dismissal of Counts VI and XIII have filed proofs of claims, namely, Golf Course Services, L.L.C. ("GCS") and Winget Construction Services, L.L.C. ("WCS"). These Defendants argue that: (1) "[t]he Committee did not plead a proper claim for recharacterization of debt as equity [because] [i]t did not allege that Defendants loaned, advanced or contributed funds to the Debtors that should be considered equity contributions;" (2) "the [Complaint] has alleged no facts to support [the] claim as to the particular proofs of claim submitted;" and (3) "[t]he [Complaint] failed to allege any inequitable conduct on the part of WCS and GCS."[176] The Court declines to address these arguments at this time, for the reasons stated in Section V-I of this opinion, below, and therefore will deny the GCS's and WCS's motion to dismiss Counts VI and XIII against them.

---

[176] Br. in Supp. of Alicia J. Winget; Brian P. Winget; Adelicia J. Tignanelli; Gwendolyn Cameron; Golf Course Services, LLC; and Winget Construction, LLC's Mot. to Dismiss Adv. Compl. at 18-20.

**I. The motions to dismiss filed by other Defendants in Case No. 04-4373.**

Three other groups of Defendants filed motions to dismiss the Complaint. These are (1) the Individual Defendants (Alicia Winget, Brian Winget, N. Matthew Winget, Adelicia Tiganelli, and Gwendolyn Cameron) plus Golf Course Services, LLC and Winget Construction, LLC;[177] (2) Venture Asia Pacific Pty., Ltd. and Venture Industries Australia Pty., Ltd.;[178] and (3) N. Mathew Winget and Linden Creek Enterprises, LLC.[179]

In their motions, these Defendants make many of the same arguments discussed in this opinion, above. The Court's rulings on those arguments apply to the motions by these Defendants as well. And these Defendants will have the benefit of the Court's dismissal of certain of Gold's claims, subject to Gold's right to file an amended complaint.

These Defendants made some additional arguments, not specifically addressed in this opinion, as to why Gold's Complaint failed adequately to state certain claims against them. The Court declines to address these additional arguments at this point, however, because it appears very likely that Gold will file an amended complaint. Gold will have leave to amend the complaint in any way he wishes; he is not limited to correcting the specific pleading deficiencies identified in this opinion. The Court anticipates that the amended complaint will be quite different, and in some ways far more detailed, than the original Complaint. As a practical matter, it is unnecessary and would be inefficient for the Court to add to this lengthy opinion by addressing Defendants' additional arguments now. If Gold files an amended complaint that is

---

[177] Docket # 117.

[178] Docket # 133.

[179] Docket ## 105, 110.

still deficient in Defendants' view, they may file a motion to dismiss the amended complaint, and renew any arguments the Court has not specifically addressed. In the unlikely event that Gold chooses not to file an amended complaint, Defendants may then renew any unaddressed arguments by filing a motion for reconsideration of today's rulings.

**J. Defendants' motions in the alternative for more definite statement**

As noted earlier, many of the moving Defendants have moved in the alternative for a more definite statement. All of those motions must be denied, because (1) the motions are in part made moot by the Court's dismissal of some of Gold's claims; (2) to the extent not moot, the motions fail to demonstrate sufficient grounds for requiring Gold to make a more definite statement under Fed.R.Civ.P. 12(e). *See* the discussion in Part III-B of this opinion.

**VI. Discussion of the motions in the six other consolidated cases**

Also before the Court are motions to dismiss, and in the alternative, motions for more definite statement, filed by Defendants in six of the other cases that are consolidated with Case No. 04-4373 — namely, Case Nos. 03-5356; 05-4963; 05-4964; 05-4968; 05-4969; and 05-4972. In each of these other cases, Gold's complaint seeks avoidance and recovery of fraudulent transfers. Gold also seeks disallowance of Defendants' claims under Code § 502(d). In Case No. 05-4972, against Larry J. Winget, Sr., Gold also seeks avoidance and recovery of preferences. And in Case No. 03-5356, against Venture Sales & Engineering Corp., Gold states many of the same type of claims asserted against the Defendants in Case No. 04-4373.[180]

These motions make many of same arguments discussed in this opinion, above. The

---

[180]  The operative complaint in Case No. 03-5356 appears to be the First Amended Complaint, filed originally by the Creditor's Committee (Docket # 26).

Court's rulings on those arguments apply to the motions in these other cases as well. The moving Defendants in these other cases will have the benefit of the Court's resulting dismissal of certain of Gold's claims, subject to Gold's right to file an amended complaint in these cases. The Court will grant Gold 30-days' leave to file an amended complaint in each of these other cases.

## VII.  Conclusion

For the reasons stated by the Court in this opinion, the Court will enter an order granting the motions to dismiss in part and denying them in part in each of these cases; granting Gold, Trustee 30-days' leave to file an amended complaint in each case; and denying all of the motions for more definite statement.

**Signed on April 17, 2009**      <u>**/s/ Thomas J. Tucker**</u>
                                   **Thomas J. Tucker**
                                   **United States Bankruptcy Judge**